482 So.2d 752 (1985)
Alfred Henry SAMPAY
v.
MORTON SALT COMPANY, et al.
No. CA 85 0828.
Court of Appeal of Louisiana, First Circuit.
December 26, 1985.
Rehearing Denied February 26, 1986.
Bernard J. Bagert, Jr., Bagert & Fitzpatrick, New Orleans, for plaintiff A. Sampay.
A. Lane Plauche and Mr. M. J. McNulty, III, Plauche, Smith & Nieset, Lake Charles, and Bruce V. Schewe, Liskow & Lewis, New Orleans, for Morton Salt Co. and Continental Cas. Co., defendants.
Bernard E. Boudreaux, Jr., Franklin, for Davis Truck Service, Inc. and James E. Davis, defendants.
Before EDWARDS, LANIER and JOHN S. COVINGTON, JJ.
JOHN S. COVINGTON, Judge.
In this personal injury action, Alfred Henry Sampay (plaintiff) and Morton Salt *753 Company and its liability insurer, Continental Casualty Company (defendants), appeal a judgment rendered pursuant to a jury verdict against defendants and in favor of plaintiff.
We reverse.
This suit arose from a tragic automobile accident which occurred on October 26, 1972, in Morgan City, Louisiana. Plaintiff was a passenger in a van owned and driven by one Larry L. Butts. The van either had stopped or was slowing to make a stop at a red light when it was rear-ended by a tractor-trailer driven by James E. Davis and owned by Davis Truck Service, Inc., a Louisiana corporation domiciled in Jeanerette. The Davis vehicle was hauling a load of salt from the Weeks Island plant of defendant Morton Salt Company to a Morton Salt customer in the New Orleans area. As a result of the accident, plaintiff's spinal cord was damaged, leading to quadriplegia.
Plaintiff filed his original petition for damages in 1973; over the years of this litigation it was followed by five supplemental and amending petitions. Made defendants were Davis Truck Service, Inc. (DTS); Joseph M. Davis, Jr. (hereafter Joe Davis), its president and principal stockholder; the driver James E. Davis, Joe Davis' brother; DTS' excess insurer, National Fire and Marine Insurance Company; Larry L. Butts and his unknown liability insurer; Morton Salt Company; and Morton Salt's liability insurer, Continental Casualty Company (CNA).
Although Larry Butts filed an answer to the original petition, he failed to respond to any of the subsequent pleadings filed by plaintiff. On September 19, 1977, plaintiff executed a release in favor of James E. Davis; Joseph M. Davis, Jr.; DTS; Hartford Accident and Indemnity Company and National Fire and Marine Insurance Company, settling for the applicable limits of the policies issued by the insurers. By judgment of October 24, 1977, these defendants were dismissed from the suit. In the release, plaintiff expressly reserved his rights as against Morton Salt and CNA, but failed to make a similar reservation of rights against Larry Butts. Additionally, because CNA had refused to produce a copy of its liability insurance policy issued to Morton Salt, the release had as a condition that should James E. Davis, Joe Davis, or DTS be subsequently found to be insured under any other policy, the release would be rendered null and void as to them.
Thereafter, Morton Salt and CNA, the only remaining defendants, filed an exception of no cause or no right of action, asserting that the express reservation of rights against them in the release was ineffective. The trial court sustained their exception, but this court eventually reversed that ruling on appeal (opinion unpublished). On remand, the trial court overruled the defendants' exception.
Defendants then filed a motion for summary judgment, asserting as grounds therefor the same argument advanced in the previously filed and overruled exception. The trial court granted defendants' motion, dismissed plaintiff's case, and on appeal this court affirmed. Sampay v. Morton Salt Company and Continental Casualty Company, 388 So.2d 62 (La.App. 1st Cir.1980). However, the Louisiana Supreme Court granted writs and reversed, remanding to the trial court for further proceedings on the merits. Sampay v. Morton Salt Co., 395 So.2d 326 (La.1981).
On July 3, 1984, defendants were granted leave to file a third party demand for indemnification against DTS and James E. Davis, in solido. Defendants were additionally allowed to file a supplemental and amending answer, in which they requested that should they be found liable to plaintiff by jury verdict, any judgment rendered against them be reduced by two-thirds, by virtue of their right of contribution as solidary obligors with the released defendants, DTS and James E. Davis. Shortly thereafter, defendants executed an agreement in favor of third party defendants not to execute on any judgment rendered in their favor on the third party demand. This third party demand was ordered tried to the bench rather than to the jury.
*754 The case finally came to trial on the merits August 27, 1984 and continued through September 4, 1984. On the last day of trial, plaintiff, having just received a copy of the CNA policy issued to Morton Salt, was granted leave to file his final supplemental and amending petition, in which he alleged that CNA had in effect at the time of the accident a comprehensive automobile liability insurance policy issued to Morton Salt under which policy's "Hired Vehicle Coverage" James E. Davis was an insured. Plaintiff additionally alleged that Morton Salt was directly, as well as vicariously, liable for James E. Davis' negligence.
At trial's conclusion, the jury returned a general verdict in plaintiff's favor in the amount of five million dollars. The trial judge subsequently reduced the jury verdict by one-half, rather than the two-thirds requested by defendants. Although he had reserved for trial by the bench the issue of James E. Davis' status as an insured under the CNA policy and had taken under advisement defendants' motion for directed verdict on the issue, the trial judge failed to expressly rule on the issue. Finally, the trial court ruled against the defendants on their third party demand against James Davis and DTS.
Both plaintiff and defendants filed motions requesting the trial judge to reconsider his ruling, which motions were denied. Thereafter, defendants filed a motion for judgment notwithstanding the verdict (JNOV) and alternatively, a new trial. This motion was denied, and shortly thereafter defendants perfected a suspensive, and plaintiff perfected a devolutive appeal.
Both plaintiff and defendants specify numerous assignments of error for review. Initially, we note that defendants do not assign as error the jury's finding (implicit in its general verdict for plaintiff) that James E. Davis was solely at fault in causing the accident which left plaintiff a quadriplegic. The facts of the case certainly support a finding that Davis' fault was the sole cause of the accident. Thus, the first issue for review is whether the jury verdict finding a basis for liability on the part of Morton Salt was manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The question of Morton Salt's liability was presented to the jury on a general verdict form. In his concluding instructions, the trial judge directed the jury to return a verdict in plaintiff's favor if it found that either DTS or James E. Davis were employees of Morton Salt, rather than independent contractors. Additionally, the court instructed the jury that even if it determined that no employee-employer relationship existed, it could still return a verdict in plaintiff's favor if it concluded that Morton Salt either: (1) exercised "regular and direct control" over DTS or James E. Davis; (2) had DTS' services on a "regular and exclusive basis"; or (3) had borrowed DTS' employee James E. Davis. However, since the case was submitted to the jury on a general verdict form, we cannot be sure of the basis of liability upon which the jury concluded in rendering its verdict against defendants. But because a general verdict was used, we must presume that the jury resolved all factual disputes in favor of the prevailing party. Stuckey v. Nissan Motor Corp. in U.S.A., 440 So.2d 799 (La.App. 1st Cir.1983), writs denied 444 So.2d 1224, 1225 (La.1984).
Plaintiff contends that the verdict of the jury may be upheld under either of two theories of liability: (1) vicarious liability under LSA-C.C. art. 2320[1], or (2) direct liability under a doctrine of "enterprise liability." We address the theory of vicarious liability first.
Under LSA-C.C. art. 2320, an employer is responsible for the torts of employees which are committed during the course and scope of employment. In order for this codal article to apply, however, a plaintiff must first prove the existence of an employer-employee *755 relationship. In determining whether such a relationship exists, our jurisprudence holds that the single most important factor to consider is the right of the alleged employer to control the work of the individual. Roberts v. State, Through Louisiana Health & Human Resources Administration, 404 So.2d 1221 (La.1981); Hickman v. Southern Pacific Transport Company, 262 So.2d 385 (La.1972); Amyx v. Henry & Hall, 227 La. 364, 79 So.2d 483 (1955). As this court stated in Florence v. Clinique Laboratories, Inc., 347 So.2d 1232 (La.App. 1st Cir.1977):
"The essential feature in establishing an employer's vicarious liability is the right of control over the time and physical activities of the party and the existence of a close relationship between the parties. A servant is a particular type of agent who has a very close relationship to the master and who is subject to the master's control." (citations omitted)
Factors to be considered in assessing the right of control include the selection and engagement of the worker, the payment of wages, and the power of control and dismissal. Savoie v. Fireman's Fund Ins. Co., 347 So.2d 188 (La.1977). However, it is well settled that whether the employer actually exercises control or supervision over the worker is not nearly as significant as whether, from the nature of the relationship, the employer had the right to do so. Amyx v. Henry & Hall, supra.
Our review of the record reveals the following facts pertinent to a determination of the true nature of the relationship between Morton Salt, DTS and James E. Davis.
It is undisputed that Davis was a payroll employee of DTS. Being a driver for the trucking company was a full-time job for him. DTS paid Davis 20% of the gross payment received on each haul he made for the company; this was the standard method of compensation of drivers in the industry. DTS deducted the standard items (social security, etc.) from Davis' checks. The driver received no compensation whatsoever from Morton Salt.
DTS was a family-owned corporation authorized to do and doing business solely in the state of Louisiana. Its president, Joe Davis, had been hauling exempt commodities (such as sand, gravel, dirt and asphalt) since the early `sixties. He and his wife and sister incorporated the business as Davis Truck Service, Inc., in late 1968. At the time of the accident, DTS had four tractors and three or four trailers. DTS was the registered owner of all vehicles, and no customer (shipper) had an interest in any of them. DTS paid for all of its own fuel, oil, tires, maintenance and repairs. No shipper ever owned an interest in the corporation or loaned it money or guaranteed a loan or held a mortgage on any of its equipment.
In late 1971, DTS leased the right to operate as a contract carrier under the authority of a permit issued by the Louisiana Public Service Commission (PSC) to one Larry Doiron, which, when approved by the PSC, allowed DTS to haul regulated commodities (such as salt) in a very limited geographical area in south Louisiana. This permit, effective as to DTS by order of the PSC issued January 24, 1972, allowed DTS to haul regulated commodities only:
"Between Berwick and New Orleans over U.S. Highways No. 90 and 61, and between the same points over U.S. Highway No. 90 and Louisiana Highways Nos. 28 and 29 via Thibodaux and Raceland, serving intermediate points."
The permit restricted DTS to hauling regulated commodities for no more than five shippers at any one time.
At the time of the accident, DTS was admittedly hauling salt from Morton Salt's Weeks Island plant to various points east. Defendants claim that this hauling was being done pursuant to a written contract, purportedly executed August 21, 1972. However, contrary to PSC regulations, this "Contract For Hauling" was never filed with the PSC. The first such contract between DTS and Morton Salt ever actually received by the PSC was executed October 31, 1973.
Louis Quinn, the Secretary of the PSC, testified that DTS, as a contract carrier, *756 could not have legally hauled salt for Morton Salt from the Weeks Island plant, regardless of the existence of a contract, because hauling from Weeks Island would have been outside the geographical limits of DTS' permit as it stood on the date of the accident, October 26, 1972. According to Mr. Quinn, DTS could not have legally hauled for Morton Salt from Weeks Island until shortly after February 28, 1973, the date of a PSC order amending DTS' permit and expanding its geographical limits of operation. He also testified that complying with PSC regulations regarding the filing of shipping contracts was a responsibility of the carrier, not the shipper.
Both Joe Davis and Morton Salt's representatives testified that they interpreted DTS' permit language as it existed at the time of the accident somewhat more expansively than did Louis Quinn; they believed that the hauling from Weeks Island was within the geographical scope of DTS' authority as a licensed contract carrier. Morton's corporate representatives stated that they relied upon Joe Davis to file a copy of the contract with the PSC; Joe Davis testified that he could not recall if he himself sent the PSC a copy of the contract or whether he relied upon his lawyer to do so. No one could explain why the "Contract For Hauling" dated August 21, 1972 was never received by the PSC.
In his October, 1972, application for the amendment to his permit which eventually resulted in the February, 1973, geographical expansion of DTS' operating authority, Joe Davis failed to mention Morton Salt as either an existing or anticipated customer. At hearings before the PSC on the application, Davis again failed to mention Morton Salt. In an October 10, 1972, PSC inspection report, Morton Salt was not named as a shipper with whom DTS had an existing contract. Mrs. Ruth Davis, DTS' vice-president, dispatcher and office manager (Joe Davis was at that time working full-time elsewhere during the day), was the source of information for the PSC inspector; she testified that she did not know all the contracts which may have been executed by her husband and so informed the inspector, requesting that he interview her husband, which he failed to do prior to filing his written report.
Testimony was presented showing that Morton Salt did not make deliveries from its Weeks Island plant with any of its own trucks; instead, it delivered its salt by contract and common carrier. At that time, orders were received in Morton Salt's Atlanta regional office and transmitted to Weeks Island with a carrier already designated to make the delivery. The Weeks Island plant contacted the carrier's dispatcher, who would arrange to have a driver and truck at the plant at the necessary time. The truck driver would arrive at Weeks Island with the order number and the salt would be loaded in his truck, under his supervision, by Morton Salt personnel. The bill of lading received by the driver would contain all the information on place and time for delivery; Morton Salt personnel gave no instructions or orders to truck drivers as to method of delivery.
Testimony was presented that Morton Salt never directed that a certain driver be used by a carrier, but that it would relay customer complaints about a particular driver to that driver's employer. On one or more occasions a complaint by a Morton Salt customer was relayed in that fashion to DTS, and Joe Davis agreed not to use that particular driver in deliveries to that particular customer. It was also established that drivers were expected to help unload when making deliveries to Morton customers.
On the day before the accident, James Davis had picked up a load from the Weeks Island plant for delivery to two separate Morton Salt customers in the New Orleans area. Becoming aware that he would be unable to deliver the second part of his load by the end of the day, Davis returned to the DTS yard in Jeanerette with the intention of making the second delivery the following morning. It is not clear from the testimony whether Davis contacted Morton Salt at Weeks Island with this information, or whether he called Mrs. Davis, his dispatcher. *757 Weeks Island personnel testified that it was not uncommon for drivers, unable to complete deliveries on time, to contact them for instructions; under these circumstances they always referred drivers to their dispatchers, who would be responsible for dealing with Morton Salt and arranging either to make delivery at a later time or to cancel the order. The Weeks Island personnel testified that under no circumstances would they issue orders to the drivers. In any case, James Davis was returning to New Orleans the following day to complete his delivery when the accident occurred.
Defendants contend that given these facts, there can be no basis for the imposition of vicarious liability on Morton Salt for the tortious acts of James E. Davis. Plaintiff contends that the jury could have properly imposed liability by concluding either that: (1) no contract existed at the time of the accident; (2) if a contract did exist, it was illegal; or (3) regardless of the existence or not of a valid contract for hauling, Morton Salt had the right of control over DTS and James E. Davis that triggers Art. 2320 liability.
A jury verdict should be maintained unless the record reflects that its conclusions of fact are not supported by the evidence or that its application of the law is clearly erroneous. Dupree v. Pechinay Saint Gobain Co., 369 So.2d 1075 (La.App. 1st Cir. 1979), writ denied 371 So.2d 1341 (La. 1979). In the absence of manifest error, the appellate court is not to disturb the finding of the jury which had reasonable evidence before it furnishing a reasonable factual basis for its verdict, based on its reasonable evaluation of credibility. Canter v. Koehring Company, 283 So.2d 716 (La.1973); Jefferson v. Landwehr, 409 So.2d 351 (La.App. 1st Cir.1981), writ denied 413 So.2d 498 (La.1983).
Given the tragic results of this accident, brought home to the jury by the undeniably moving in-court testimony of the plaintiff, it would have been surprising indeed had the jury not found in plaintiff's favor. However, after an extensive review of the record on appeal, we are forced to conclude that the jury verdict was manifestly erroneous if based upon a finding of vicarious liability under LSA-C.C. art. 2320. Applying the principles, outlined above, relevant to making a determination of the nature of the relationship between Morton Salt, DTS and James E. Davis, to the facts of this case, and resolving all factual disputes in plaintiff's favor, we conclude that the relationship of DTS and James E. Davis to Morton Salt was not that of employee and employer for purposes of Art. 2320 vicarious liability in tort.
A second possible basis for upholding the jury's verdict, plaintiff contends, is under a theory of direct liability, or "enterprise liability," although he concedes that a proposed jury charge on "enterprise liability" was rejected by the trial judge.
The crux of plaintiff's argument is that because the delivery of its product (salt) from the place of manufacture to its customers is an integral part of Morton Salt's business enterprise, and because the delivery of its product by carriers such as DTS inures to the benefit of Morton Salt, the latter must be held liable, as a matter of policy, for the tortious acts committed by employees of carriers such as DTS in the process of making Morton Salt's deliveries.
It is well established that certain ultrahazardous activities involve such high risk of injury that a party may not undertake them without being held absolutely liable for resulting damages. These include activities such as "... pile driving, storage of toxic gas, blasting with explosives, crop dusting with airplanes, and the like ..." Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982). These activities are similar in that they are likely to cause damage even when there is no substandard conduct on anyone's part and in that, by their very nature, they cannot be done at all without a high degree of risk of injury. Kent, supra.
Simply speaking, the activity of delivering salt by truck over Louisiana highways does not fall within this category of ultrahazardous activities. This is an activity *758 which can be done without a high degree of risk of injury, and when the activity does result in injury, it is almost always because of substandard conduct. There is no basis in policy or fact for imposition of liability under this theory in the instant case.
A final basis for liability on the part of CNA asserted by plaintiff was not specifically ruled on below by either judge or jury. The question of whether the comprehensive automobile liability policy issued by CNA to Morton Salt provided direct coverage to James E. Davis as the driver of a "hired automobile" was withheld by the trial judge for a bench determination. However, while the trial court failed to expressly rule on the issue when it subsequently rendered judgment, it by necessary implication ruled against plaintiff on the issue.
The question for resolution is whether the vehicle driven by James E. Davis and owned by DTS was a "hired automobile" as defined by the policy in effect at the time of the accident, and if so, whether Davis was excluded from coverage by any other provision therein.
Plaintiff contends that James E. Davis was insured by the policy in question by the following provision:
"Persons insured
Each of the following is an insured ...
(a) the named insured (Morton Salt);
(b) ...
(2) any other person while using an owned automobile, aircraft or watercraft or a hired automobile, ... with the permission of the named insured,..."
"Hired automobile" is defined by the policy as:
... an automobile ... not owned by the name insured which is used under contract in behalf of, or loaned to, the named insured, provided such automobile... is not owned by or registered in the name of (a) a partner or executive officer of the named insured or (b) an employee or agent of the named insured who is granted an operating allowance of any sort for the use of such automobile ..."
Defendant contends, first, that the vehicle involved was not a "hired automobile" within the meaning of policy provisions; second, that should it be so considered, James E. Davis is excluded from coverage by the following policy provision:
"None of the following is an insured....:
. . . . .
(ii) any owner or lessee (of whom the named insured is a sublessee) of a hired automobile, ..., or any agent or employee of such owner or lessee;..."
For a vehicle to constitute a "hired automobile," there must be a separate contract by which the vehicle is hired or leased to the named insured for his exclusive use or control. Sprow v. Hartford Insurance Co., 594 F.2d 418 (5th Cir.1979); Russom v. Insurance Company of North America, 421 F.2d 985 (6th Cir.1970). Here, there was clearly no agreement between Morton Salt and DTS whereby the former leased, hired or borrowed the vehicle in question from DTS, the title owner, for Morton Salt's exclusive use or control. We find plaintiff's arguments to the contrary unpersuasive.
Accordingly, the vehicle being operated by James E. Davis at the time of the accident was not a "hired automobile" covered by the CNA policy. Even if we were to determine otherwise, the exclusionary clause quoted above would preclude coverage, as DTS was the title owner of the vehicle and, as we have determined supra, James E. Davis was the employee of the owner DTS at the time of the accident. For these reasons, there can be no liability under the policy for the negligence of James E. Davis.
Because we reverse the judgment of the trial court on the main issue of liability, we have no need to address the remaining issues involved in the parties' assignments of error.
For the foregoing reasons, the judgment of the trial court in favor of plaintiff and against defendants Morton Salt Company *759 and Continental Casualty Company on plaintiff's demand is reversed and plaintiff's suit is dismissed; all costs to be paid by plaintiff.
REVERSED.
NOTES
[1] LSA-C.C. art. 2320 provides, in pertinent part:

"Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed."