**UNITED STATES FIDELITY AND GUARANTY COMPANY**

v.

**EMPLOYERS CASUALTY COMPANY.**

Civ. A. No. 87–1141.

United States District Court,
E.D. Louisiana.

Nov. 4, 1987.

Mary Clare Hartman, Hartman & Associates, Metairie, La., for plaintiff.

Esmond Phelps, II, T.A., John P. Sneed, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendant.

OPINION

CHARLES SCHWARTZ, Jr., District Judge.

This matter as to insurance coverage was tried before the Court without a jury on Thursday, October 29, 1987. Having considered the testimony of the witnesses, the record and the applicable law, the Court granted defendant's oral motion for involuntary dismissal. In this Opinion, the Court explains its reasons for granting the motion. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as conclusions of law; to the extent any of the following conclusions of law constitute findings of fact, they are adopted as findings of fact.

*Findings of Fact*

The plaintiff, United States Fidelity and Guaranty Company (USF & G), is a Maryland corporation with its principal place of business in Maryland. The defendant, Employers National Insurance Company (Employers),[1] is a Texas corporation with its principal place of business in Texas. The amount in controversy exceeds $10,000, exclusive of interest and costs.

Upon joint stipulation, the trial was bifurcated with the following issue to be tried first: whether Comprehensive General Liability (CGL) Insurance Policy No. CGL–A–828421 issued by Employers (Employers' Policy, Exhibit D–1) provides coverage for the liability of T & J Services, Inc. (T & J) assessed in *Freeman v. Varnado*, 480 So.2d 980 (La.App. 4th Cir.1985), *writ denied*, 484 So.2d 674 (La.1986), under the facts and law as found by the Louisiana Fourth Circuit Court of Appeal. The parties further stipulated that for purposes of the trial of this question only, this Court

---

1. The plaintiff erroneously named Employers Casualty Company as the defendant. Employers National Insurance Company has stipulated that it, rather than Employers Casualty Company, is the proper party defendant in this action.

may assume that the decision in *Freeman v. Varnado* is correct.[2]

A brief summary of *Freeman v. Varnado* is, therefore, in order. On June 1, 1977, a dump truck backed over and killed John Freeman at LP & L's Waterford 3 construction site near Taft, Louisiana. *Id.* at 982. The truck was owned and driven by Floyd Varnado, who was an independent contractor hired by T & J to haul sand to the site. *Id.* at 982, 986–87. Mr. Varnado's fault was held "a legal cause of this fatal accident." *Id.* at 986. Although not vicariously liable for Varnado's fault, T & J was held liable for violating an independent duty under OSHA regulations by not "inspecting the back-up alarms on the trucks provided by its independent contractors" and by not "monitoring conditions on the construction site that affected the sand delivery." *Id.* at 987. Accordingly, the Fourth Circuit held Varnado, T & J and USF & G (as T & J's insurer joined as a defendant in the suit) liable *in solido* for $370,833.50 plus interest from date of demand.[3] *Id.* at 989–90.

At the time of the accident, both Employers' Policy and Comprehensive General Liability/General Automobile Liability Insurance Policy No. 1CC A 50350 issued by USF & G (USF & G's Policy, Exhibit D–2) were in effect and were providing coverage to T & J. The primary question here is whether Employers' Policy covered the accident.

USF & G called but one witness:[4] Gerald R. Stell, Employers' expert witness and manager of its national underwriting unit. He testified primarily about Exclusion (b)[5] of Employers' Policy and its relation to CGL policies such as Employers' Policy and general automobile policies such as USF & G's Policy. This clause, the standard automobile exclusion clause, reads in whole:

This insurance does not apply:

    .        .        .        .        .

(b) to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of

 (1) any automobile or aircraft owned or operated by or rented or loaned to any insured, or

 (2) any other automobile or aircraft operated by any person in the course of his employment by any insured;

but this exclusion does not apply to the parking of an automobile on premises owned by, rented to or controlled by the named insured or the ways immediately adjoining, if such automobile is not owned by or rented or loaned to any insured.

According to Mr. Stell, the form used by Employers for its policy was the standard ISO form used in 1977.[6]

---

**2.** Although Employers intervened in the state case to recover its worker's compensation payments made on behalf of the deceased, it was never asked to defend T & J. Because the Court disposes of the present action on other grounds, the Court need not decide (1) the extent, if any, to which either Employers or USF & G is bound by the Fourth Circuit decision or (2) whether USF & G's equitable theory of unjust enrichment applies to the present action.

**3.** USF & G has paid the plaintiffs $698,313.96. *See* Exhibit P–6. The amount over $370,833.50 was presumably the interest owing. *See* Exhibit D–3, p. 1.

**4.** Because USF & G had never exchanged any expert report pursuant to the Court's standard pre-trial deadline order of May 11, 1987, Employers moved in limine two days before trial to exclude testimony from any expert witnesses proffered by USF & G. The Court granted the motion. *See* F.R.Civ.P. 16; *cf. Book v. Nordrill,*

*Inc.,* 826 F.2d 1457, 1460–61 (5th Cir.1987) (affirming the district court's exclusion of testimony on a medical expert report exchanged one business day before trial).

**5.** USF & G's counsel argued that Endorsement No. 8 to Employers' Policy eliminated Exclusion (b). She has confused the letter "h" with the letter "b," for the endorsement eliminates Exclusion (h), not Exclusion (b).

**6.** The ISO, or Insurance Services Office, is a nationwide insurance organization that draws up forms for member companies. The ISO submits its proposed forms to the different states for approval, and when approved the forms are used by all its member companies. According to Mr. Stell, "everyone in Louisiana uses the ISO form" with the same policy exclusion.

The CGL portion of USF & G's Policy, including Exclusion (b), has the virtually identical terms of coverage as Employers' Policy.

Both in his expert report (Exhibit D–10, p. 1) and on his examination by USF & G, Mr. Stell stated that the purpose of this exclusion clause in a CGL policy is to exclude exposures that are properly insured under an auto policy such as USF & G's Policy. Exclusion (b)(1), he testified, is intended to exclude from coverage under the CGL policy those automobiles, among others, used on behalf of the insured for consideration. Exclusion (b)(2), he testified, is intended primarily to exclude instances where an employee of the insured uses his own personal vehicle for his employer (the insured), but is broad enough so as also to exclude from coverage bodily injury from the use of a dump truck by a truck driver who is using his own truck under contract for the insured.

Mr. Stell testified that the accident here was "obviously covered" under and concerned a standard auto policy such as USF & G's Policy and not a CGL policy such as Employers' Policy. He stated that this position represented the position of the insurance industry. According to Mr. Stell, it has been the general industry custom not to cover claims under both auto and CGL policies; if a claim is covered under one type policy, it is not covered under the other type policy.[7]

Mr. Stell further testified that Mr. Varnado's dump truck was a "hired automobile" covered under USF & G's Policy.[8] He read the policy definition of "hired automobile" in Section V of Coverage C (Bodily Injury Liability for Comprehensive Automobile Liability Insurance) of USF & G's Policy: "'hired automobile' means an automobile not owned by the Named Insured which is used under contract in behalf of, or loaned to, the Named Insured ...". He testified that the "hired automobile" provision is "primarily used" for the purpose of including within an auto policy vehicles used by independent contractors of the named insured.

USF & G's counsel posed the following hypothetical: Employers enters into a CGL policy with a contractor for road work; the insured negligently fails to put up barriers around a hole the insured has excavated; then a vehicle falls into the hole. She then asked Mr. Stell if the accident would be covered under an auto policy or a CGL policy. He testified that if "the vehicle had nothing to do with the insured," then the accident would be covered under the CGL policy, but that if the vehicle was being used on behalf of the insured, the accident would be covered under the auto policy and not under the CGL policy. He acknowledged that the CGL auto exclusion clause did not include the specific language "on behalf of the insured," but stated that his opinion was based on the policy language and exclusions of the auto and CGL policies as well as on the general industry custom. He further testified that Employers' Policy had no exclusion clause for an insured's liability for not providing a safe workplace, but added that such liability might nonetheless be excluded under another exclusion clause.

After USF & G rested its case as to insurance coverage, Employers called one additional witness: William L. Grace of Rebsamen Insurance, LP & L's insurance agent for the Waterford 3 construction site. Prior to the accident, he had in person and in writing discussed Employers' Policy with T & J. See, e.g., Exhibit D–2 (letters written in 1976 from Mr. Grace to T & J).

Under the "Owner Controlled Insurance Program" for the construction project, Employers provided no automobile insurance; this insurance the individual contractors and subcontractors had to obtain on their own. Mr. Grace personally went over with T & J the "Outline of Procedures Between Contractors, LP & L, Ebasco and Brokers 2/1/76" (Exhibit D–8), which includes on page 7 the following:

7. Mr. Stell noted that it is possible under industry custom to have autos specially covered under CGL policies, but noted that an additional premium must be paid for such additional coverage. He was "almost certain" that this special coverage was available in 1977.

8. As Mr. Stell acknowledged, the term "hired automobile" does not appear in CGL policies such as Employers' Policy.

### AUTOMOBILE LIABILITY & PHYSICAL DAMAGE

Since Contractor provides own insurance on automobiles, notice of an occurrence should be reported to Contractor's own insurance company.

Further, he furnished T & J with the "Waterford Steam Electric Station Unit No. 3 Insurance Manual" (Exhibit D–9), which provides in Section VI on page 5 that "All Contractors will maintain at their own expense: 1. Comprehensive Automobile Liability Insurance covering the use of all owned, non-owned and hired automobiles ..." [9]

Mr. Grace testified that there was no intent for Employers to provide automobile liability insurance to T & J and that the purpose for LP & L's procedure was twofold: first, to provide a safe work place and second, to reduce expenses by avoiding simultaneous coverage for a single claim under two policies.

After Mr. Grace's testimony, Employers orally moved for involuntary dismissal. The Court granted the motion.

### Conclusions of Law

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. Because this is a diversity action, Louisiana state law governs. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

The question before the Court is a simple one: whether Employers' Policy covers the accident in *Freeman v. Varnado.* If it does not, then USF & G has no claim against Employers and the case is over; if it does, then the case must continue. Put another way, the question is whether Exclusion (b) applies to the accident.

In determining whether Exclusion (b) applies, the Court must first decide whether T & J's liability "ar[ose] out of the ... use

... of any automobile." Varnado's truck is without doubt an automobile within the meaning of Employers' Policy. Employers' Policy, Definitions, Exhibit D–1, p. 1 ("'automobile' means a land motor vehicle, trailer or semi-trailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include mobile equipment"); *accord* USF & G's Policy, Definitions, Exhibit P–2, p. 1 (same definition); *see also Guilbeau v. Liberty Mutual Insurance Co.,* 345 So.2d 79, 83 (La.App. 1st Cir.), *writ denied,* 346 So.2d 716 (La.1977). Nor has there been any testimony or argument otherwise.

The crux of USF & G's argument appears to be as follows: since T & J was held liable on grounds of not providing a safe work place to the decedent and not on grounds of vicarious liability, T & J's liability (and thus USF & G's liability) did not arise out of the use of an automobile within the meaning of Exclusion (b) of Employers' Policy. The argument must fail. While the standard of care the Fourth Circuit applied to T & J was derived from OSHA regulations, 480 So.2d at 987, the Fourth Circuit did not hold that the basis of T & J's liability arose *outside* the "maintenance, operation [or] use" of the truck.[10]

■ The insuring language of USF & G's Policy and the excluding language of Employers' Policy are written not in terms of the applicable standard of care, but in terms of the nature of the risk and resulting injury. The issue, for purposes of interpreting Employers' exclusion, is not *why* T & J's conduct was faulty, but *whether* T & J's liability for Freeman's death arose out of the use of the truck. Common sense and Louisiana case law require this Court to find that T & J's liability did arise out of the use of the truck. *See Picou v. Ferrara,* 412 So.2d 1297, 1299–300 (La.1982) (identical CGL Exclusion (b) clause applied

---

**9.** USF & G objected to the introduction of Exhibits D–8 and D–9 into evidence on the ground that they were irrelevant because there was no evidence that the dumptruck was a hired, owned or nonowned automobile of T & J. The Court overruled the objection on the ground that there was such evidence in the Fourth Circuit decision; the Court further notes that these two exhibits are relevant as to the issue of intent of the terms of Employers' Policy.

**10.** Because USF & G's Policy provided both CGL and general auto coverage, the Fourth Circuit did not even have to consider the question of auto use.

in case where an employee's truck struck plaintiff and where plaintiff sued the employer on both the theory of vicarious liability and the theory of independent negligence in entrusting an incompetent driver); *cf. LeJeune v. Allstate Insurance Co.,* 365 So.2d 471, 479 (La.1978) (because a sheriff deputy's use of his automobile was incidental to and independent of the breach of his duty to secure an intersection, his professional liability insurer's auto exclusion clause did not apply). Indeed, auto use has been found in cases far more attenuated than in the present action. *See, e.g., Hellmers v. Department of Transportation and Development,* 503 So.2d 174, 176 (La.App. 4th Cir.), *writs denied,* 505 So.2d 1141, 1149 (La.1987); *Carter v. City Parish Government of East Baton Rouge,* 423 So.2d 1080, 1087 (La.1982). In sum, T & J's breach of duty did not exist independent of the use of Varnado's truck, for without use of the truck, there would be no need for a back-up alarm or flagman.

■ The Court must, however, find more than mere auto use for Employers' Exclusion (b) to apply. The Court must determine whether Employers' Policy excludes coverage of T & J's liability for auto use by *an independent contractor* working for T & J. The Court believes the policy does exclude such.

The parties concentrated on (b)(1) of the Exclusion, whereas the Court finds (b)(2) to be the controlling part. The important question is whether Varnado's use constituted use by a "person in the course of his employment by" T & J.

The clause has two textually possible readings. On the one hand, the clause may be read to mean "use by a person who is performing a service for T & J, whether as an employee of T & J, an independent contractor of T & J or otherwise." On the other hand, the clause may be read more narrowly to mean "use by a T & J employee while working for T & J." A survey of the dictionaries at the Court's quick disposal suggests that the broader interpretation accords with the more common meaning.[11] But Court does not rest its opinion on this sole ground; the Court's duty is to interpret the clause in light of the entire policy. From Mr. Stell's report and testimony,[12] to which no contradictory evidence has been offered, the Court finds that the first interpretation reflects both Employers' intent and the insurance industry's general custom.

To read the clause narrowly, as if the word "person" were to read "employee," would defeat the industry custom of having coverage under either a CGL policy or a general auto policy, but not under both. *See also LeJeune,* 365 So.2d at 479 (observing that the two policies are designed to cover separate risks and holding that the auto policy did not apply because the CGL policy did apply). Because the issue before the Court is not whether T & J had coverage, but rather is which one of the two policies—Employers' CGL policy or USF & G's auto policy—covers T & J's liability, the general rule that insurance contracts should be strictly construed against the insurer does not apply here.

The accident is covered not by the standard CGL policy, but by the standard auto policy. The insuring language of USF & G's Policy states that USF & G will pay for any liability T & J is "obligated to pay as damages because of bodily injury ... aris-

11. These dictionaries give the following pertinent definitions of the word "employ." *The Random House Dictionary of the English Language* 468 (unabridged ed. 1969) ("1. to use the services of (a person or persons); have or keep in one's services"); 1 *The Oxford English Dictionary* 855 (complete, compact ed. 1971) ("3. to use the services of (a person) in a professional capacity, or in the transaction of some special business; to have or maintain (persons) in one's service"); *Webster's New Collegiate Dictionary* 373 (1974) ("1a: to make use of (someone or something inactive) ... c(1): to use or engage the services of (2): to provide with a job that pays wages or a salary").

12. While Mr. Stell suggested that the auto used by an independent contractor is excluded in a CGL policy by Exclusion (b)(1), he acknowledged at the Court's questioning that such use is also excluded under (b)(2). Because of the Court's findings as to (b)(2), the Court does not address the legal question of whether an independent contractor's auto use comes within (b)(1).

ing out of the ownership, maintenance or use … of *any* automobile." While Varnado may not be an additional insured under USF & G's Policy and, notwithstanding Mr. Stell's testimony to contrary, the truck may not be a hired automobile under USF & G's Policy,[13] T & J's liability did not depend on Varnado's being an additional insured; T & J was held independently liable and, as shown above, the liability arose out of the use of an automobile.

The Court finds that Employers followed the general industry custom of not providing coverage in a CGL policy for a risk that is instead insured under a general auto policy. As Mr. Grace's testimony shows, Employers followed this custom and specifically brought the point to T & J's attention so that it would properly obtain auto insurance for any liability it might incur from the use of an automobile such as Varnado's truck.

Nor is the industry custom an unreasonable one or one that always works to the detriment of auto insurers and to the benefit of CGL insurers. The custom that risks not be insurable under both CGL policies and auto policies allows for greater cost savings to and efficiency for society: without needless dual coverage—for which risks separate premiums would be paid under both policies—an insured may, as Mr. Grace testified, reduce its expenses in obtaining insurance without additional exposure to liability.

In sum, the accident was insured under USF & G's policy because T & J's liability for the accident arose out of the use of an automobile. Accordingly, the accident was not insured under CGL policies such as Employers' Policy.

### Conclusion

Because the accident comes within Exclusion (b) of Employers' Policy, Employers' Policy does not provide coverage for claims on the accident. Without such coverage, USF & G has no right to relief against Employers. For these reasons, the Court ordered an involuntary dismissal.

Accordingly, IT IS ORDERED that there be Judgment in favor of Employers National Insurance Company and against USF & G and that USF & G's complaint be dismissed with prejudice at USF & G's costs. The Clerk of Court is hereby directed to enter judgment in accordance herewith.

---

**13.** *See Sampay v. Morton Salt Co.,* 482 So.2d 752, 758 (La.App. 1st Cir.1985), *writ granted,* 488 So.2d 684, *appeal dismissed on joint motion,* 496 So.2d 315 (La.1986); *Guilbeau,* 345 So.2d at 82–83.