[No. G009430. Fourth Dist., Div. Three. July 30, 1991.]

AMERICAN STAR INSURANCE COMPANY, Plaintiff and Respondent,
v.
INSURANCE COMPANY OF THE WEST, Defendant and Appellant.

**COUNSEL**

Quisenberry & Barbanel, John N. Quisenberry and Wendy M. Feldman for Defendant and Appellant.

Shield & Smith and Douglas Fee for Plaintiff and Respondent.

**OPINION**

**SILLS, P. J.**—This is a fight between two insurance companies over who should pay for the tragic results of an auto accident involving a water truck

in January 1987. The matter boils down to the applicability of the auto exclusion in one insurer's policy. The appeal requires us to decide whether a water truck equipped with permanently attached spraying equipment comes within the scope of the auto exclusion of the 1986 version of the standard commercial general liability (CGL) insurance policy. We conclude the policy *unambiguously* classifies such a truck as "mobile equipment" and therefore beyond the purview of the auto exclusion. Because the insuring clause provides coverage and the auto exclusion does not apply, the judgment must be affirmed.

## FACTS

The parties have agreed on certain essential facts. ABC Water Service (the policyholder) owned a GMC Brigadier 4000 water truck. The truck was used to spray down construction sites during grading operations. It had a 4000-gallon tank and permanently attached spraying equipment. Operation of the spraying equipment involved a pump which pumped water from the tank. The truck was normally used off road, not licensed for road use, and trailered to job sites. Low gearing kept its speed from exceeding 25 miles an hour.

On January 8, 1987, one of the policyholder's employees was driving the truck to a highway patrol inspection station. En route, the employee ran a red light at the corner of Dale and Katella in Stanton, causing an accident which killed one driver and seriously injured another. The wife and children of the deceased driver along with the injured driver (the third party claimants) made claims on the policyholder.

At the time of the accident, the policyholder had liability policies with both American Star Insurance Company (American Star) and Insurance Company of the West (ICW). American Star's policy was a general liability policy without an auto exclusion. ICW's policy was the standard 1986 version of the CGL.[1]

In late February 1987, ICW denied it had any duty to defend or indemnify the policyholder. The third party claimants settled their claims against the

---

[1]The heart of ICW's policy was Insurance Services Office (ISO) form "CG 00 01 11 85." ISO is a nationwide organization which drafts standard insurance forms for its member companies, collects loss data and estimates risks relevant to the forms. (See generally, *In re: Insurance Antitrust Litigation* (9th Cir. 1991) 938 F.2d 919, 923; see also *U.S. Fidelity and Guar. Co.* v. *Employers Cas. Co.* (E.D.La. 1987) 672 F.Supp. 939, 940, fn. 6.) The standard commercial insurance forms undergo revisions from time to time. The last major overhaul took effect 1986, when the name of the standard commercial policy was changed from "comprehensive" general liability to "commercial" general liability.

policyholder in October 1987 for a total of $324,042 without litigation.[2] American Star paid the settlement amount, plus another $9,189 in "defense costs."[3] It then sued ICW, seeking a declaration ICW's policy obligated it to defend the policyholder, and, having failed to defend, ICW had waived any right to disclaim coverage and was therefore obligated to pay the settlement and defense costs.

The applicable language of ICW's policy is set out in footnotes 4, 5, and 6. That language consists of the relevant portions of the policy's insuring clause,[4] auto exclusion,[5] and definitions of "mobile equipment" and "auto."[6]

---

[2] The third party claimants settled prior to filing suit.

[3] These consisted of defense counsel fees, costs of investigation, services provided by Judicial Arbitration and Mediation Services (JAMS), and photocopying.

[4] "1.  Insuring Agreement.
  "a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS— COVERAGES A AND B."

[5] "2.  Exclusions.
  "This insurance does not apply to:
  "..................................................................
  "g.  'Bodily injury' or 'property damage' arising out of the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and 'loading or unloading.' This exclusion does not apply to:

  ..................................................................
      (5)  'Bodily injury' or 'property damage' arising out of the operation of any of the equipment listed in paragraph f.(2) or f.(3) of the definition of 'mobil equipment' (Section V.8)."

"SECTION V—DEFINITIONS
"..................................................................
"2   'Auto' means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including an attached machinery or equipment. But 'auto' does not include 'mobile equipment.' "

[6] "8   'Mobile equipment' means any of the following types of land vehicles, including any mattached machinery or equipment:
  "a.  Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;
  "..................................................................
  "f.  Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.
      "However, self-propelled vehicles with the following types of permanently attached equipment are not 'mobile equipment' but will be considered 'autos:'
      (1)  Equipment designed primarily for:
          (a)  Snow removal;
          (b)  Road maintenance, but not construction or resurfacing;
          (c)  Street cleaning;
      (2)  Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

The two insurers each brought motions for summary judgment; American Star prevailed. The trial court ordered ICW to pay American Star $166,616, that is, one-half the combined settlement amount plus defense costs. ICW now appeals.

### DISCUSSION

### *Interpretation of the Policy*

■ In questions of insurance coverage, the proper initial focus must be the language of the policy itself. (See *Garriott Crop Dusting Co.* v. *Superior Court* (1990) 221 Cal.App.3d 783, 790 [270 Cal.Rptr. 678]; *Harbor Ins. Co.* v. *Central National Ins. Co.* (1985) 165 Cal.App.3d 1029, 1034-1035 [211 Cal.Rptr. 902].) The first issue is whether the claim falls within the scope of the basic coverage of the policy (*Royal Globe Ins. Co.* v. *Whitaker* (1986) 181 Cal.App.3d 532, 536-537 [226 Cal.Rptr. 435]) defined in the insuring clause (e.g., *State Farm Mut. Auto. Ins. Co.* v. *Jacober* (1973) 10 Cal.3d 193, 199-201 [110 Cal.Rptr. 1, 514 P.2d 953]). If the claim does not fall within the insuring clause, there is no need to analyze further. (E.g., *St. Paul Fire & Marine Ins. Co.* v. *Superior Court* (1984) 161 Cal.App.3d 1199, 1203, fn. 1 [208 Cal.Rptr. 5]; *Giddings* v. *Industrial Indemnity Co.* (1980) 112 Cal.App.3d 213, 218-220 [169 Cal.Rptr. 278].) There is no coverage.

If the claim does fall within the insuring clause, the next question is whether any exclusion applies. A conspicuous, unambiguous applicable exclusion will override the insuring clause and eliminate coverage the policy might otherwise afford. (E.g., *National Ins. Underwriters* v. *Carter* (1976) 17 Cal.3d 380 [131 Cal.Rptr. 42, 551 P.2d 362].)

Insuring clauses and exclusions fulfill different functions (*National Ins. Underwriters* v. *Carter, supra,* 17 Cal.3d at p. 385) and entail different burdens of proof. The party claiming coverage has the burden to show a claim falls within the scope of basic coverage; the insurer has the burden of showing a claim falls within an exclusion. (*Dyer* v. *Northbrook Property & Casualty Ins. Co.* (1989) 210 Cal.App.3d 1540, 1547 [259 Cal.Rptr. 298]; *Royal Globe Ins. Co.* v. *Whitaker, supra,* 181 Cal.App.3d at p. 537.)

■ Here, there is no doubt the claims asserted by the third party claimants fall within the insuring clause. There was bodily injury occurring

---

(3)  Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment."

The entire text of the definition of mobile equipment, including the omitted categories "b." through "e.," is set out in the appendix.

during the policy period caused by an accident. Coverage under the ICW policy therefore depends on the applicability of the auto exclusion.

The policy's auto exclusion clearly excludes coverage for bodily injury arising out of the use of autos, but does not tell the reader what an "auto" is. For that the reader must turn to the definitions section. There the reader learns an "auto" is a "land motor vehicle" but is *not* " 'mobile equipment.' " A water truck certainly is a "land motor vehicle." But this does not end the inquiry. The definition of "mobile equipment" tells the reader "mobile equipment" is *any one* of certain types of "land vehicles." Obviously, then, land vehicles of a certain type are "mobile equipment," and not "autos," for purposes of the auto exclusion. The only way for the reader to ascertain whether a water truck is an "auto" or "mobile equipment" is to examine the types of land vehicles described as "mobile equipment" to see whether "any" of them fit.

There are six *equal* categories of mobile equipment, "a." through "f." There can be no reasonable doubt the water truck in this case falls within the first category, "a." The water truck in this case is a vehicle "designed for use principally off public roads."

The CGL form in this case adheres to a rigid "outline" format. It is divided into five sections corresponding to Roman numerals. Each section is divided into various subsections corresponding to Arabic numbers. The divisions within the subsections are marked by lower case letters, and the subdivisions of those divisions are marked by Arabic numbers in parentheses. The typographical placement of text on the page corresponds to its place in the outline. An ordinary reader, trying to figure out the policy, would naturally conclude categories "a." through "f." specify six different kinds of land vehicles, *any one of which* would bring a given "land vehicle" within the classification of "mobile equipment."

ICW points to language which, *both organizationally and typographically, is completely within category "f.",* to argue the water truck in this case should fall within the auto exclusion. That language states self-propelled vehicles with certain types of "permanently attached" equipment will be considered autos. Among the types of equipment listed is spraying equipment. Organizationally, the reference to spraying equipment is found within subcategory "(3)" beneath category "f.," confirming it to be part of subcategory "f." Typographically, the language is found in text which is either flush with the initial text of category "f." or indented beneath it such that a reader would naturally conclude it only applied to the text of category "f."

The interpretation of given words in an insurance policy depends on their use in the instrument and the subject matter to which they refer. (*Siegman* v. *Orion Ins. Co.* (1971) 16 Cal.App.3d 533, 536 [94 Cal.Rptr. 80]; cf. *Chamberlin* v. *Smith* (1977) 72 Cal.App.3d 835, 850 [140 Cal.Rptr. 493].) In this case, both the outline format of the policy and the typographical indentation of the language relied on by ICW compel the conclusion the language within category "f." relied on by ICW has no application to category "a." That language, rather, could only be construed by the reader as a subtopic within category "f.," affecting only the "mobile equipment" otherwise set forth in category "f." ("Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.") Within outlines, subtopics are divisions of the topic above them. (Warriner & Griffith, English Grammar and Composition: Complete Course (1957) p. 383.) If the drafters of the CGL form in question had wanted the text designating certain vehicles with permanently attached spraying equipment to *always* be classified as "autos" for purposes of the auto exclusion, they should have set the text in such a way that it would control *all* categories "a." through "f.," not just category "f."

For the same general reason, the language next to item (5) in the auto exclusion restricting the exclusion from reaching the operation of equipment listed in two subcategories of category "f." has no bearing on this case. That language has nothing to do with category "a." It only affects category "f." and category "f." cannot undo a classification made by category "a."

The policy therefore *unambiguously* characterizes the water truck in this case as "mobile equipment." Because "mobile equipment" is clearly not included within the definition of "auto," the water truck is not within the auto exclusion. Because the claim in this case clearly falls within the insuring clause, ICW's policy therefore provides coverage for the claims made by the third party claimants.

### Issues Extrinsic to the Insurance Policy

ICW raises a number of issues having less to do with the actual language of the policy than with matters extrinsic to it.

### Precedent

The only state court case interpreting mobile equipment is *Truck Ins. Exch.* v. *Transamerica Ins. Co.* (1972) 28 Cal.App.3d 787 [104 Cal.Rptr. 893].

*Truck* held a dump truck being used to carry blacktop from site to site during road patching work was a truck, and not mobile equipment. An auto accident occurred while the truck was crossing the southbound lanes of Interstate 5. In deciding whether the dump truck was mobile equipment, the court stated, without reference to either policy language or legal authority, "[t]he question must be determined by the test of function and intended use of the dump truck." (*Id.* at p. 792.) The court then concluded the dump truck was not mobile equipment because its "primary intended use" was the transportation of material. (*Ibid.*)

*Truck* offers no support for ICW's position. Rather, it suggests, if not compels, the opposite. Under category "a." of the definitions of mobile equipment, a vehicle is "mobile equipment" if it is "designed for use principally off public roads." The "function and intended use" test set out in *Truck* would simply appear to be another way of phrasing "designed for use principally." Applying either group of words to the instant facts yields the same result. The "intended" or "designed" use of the water truck was for "off public roads." The truck was normally taken by trailer from site to site and low gearing prevented its effective use on public highways.

### Duplicate Coverage

Insurers are loath to offer coverage for risks in CGL policies which are otherwise covered in general auto policies. (*U.S. Fidelity and Guar. Co.* v. *Employers Cas. Co., supra,* 672 F.Supp. at p. 944.) Separating risks allows for efficiency and cost savings to policyholders. "The custom that risks not be insurable under both CGL policies and auto policies allows for greater cost savings to and efficiency for society: without needless dual coverage—for which risks separate premiums would be paid under both policies—an insured may . . . reduce its expenses in obtaining insurance without additional exposure to liability." (*Ibid.*) Accordingly, business auto policies and CGL policies typically have reciprocal exclusions for autos and mobile equipment. (E.g., *Russo* v. *Veran, Inc.* (La.Ct.App. 1986) 488 So.2d 372, 374-375 [noting one insurer's CGL policy contained same definition of auto and mobile equipment as another insurer's auto policy].) These reciprocal exclusions have given rise to a few cases exploring when a specially equipped truck is a truck (i.e., an "auto" for purposes of the auto exclusion) and when it is "mobile equipment."[7]

---

[7]See, e.g., *Fidelity & Cas. Co.* v. *Reserve Ins. Co.* (9th Cir. 1979) 596 F.2d 914 [truck equipped with arc welder was within auto exclusion because normal purpose of the truck was transportation of equipment and arc welder was not permanently attached]; *Russo* v. *Veran, Inc., supra,* 488 So.2d 372 [truck equipped with hoisting pole was mobile equipment and

■ In the present case, ICW directs our attention to American Star's liability policy (not a CGL policy), which clearly covered the claim. The implication is ICW's CGL policy therefore should not provide coverage, given that coverage for autos and mobile equipment is supposed to be mutually exclusive.

This would be a crackerjack argument if it did not run afoul of the actual text of ICW's CGL policy. It is well established where policy language is clear, courts will not adopt strained interpretations to fasten on insurers liability for risks they otherwise had not assumed. (E.g., *Suarez v. Life Ins. Co. of North America* (1988) 206 Cal.App.3d 1396, 1402 [254 Cal.Rptr. 377] ["When the language is clear a court should not give it a strained construction to impose on the insurer a liability it has not assumed"]; *Insurance Co. of the West v. Haralambos Beverage Co.* (1987) 195 Cal.App.3d 1308, 1316 [241 Cal.Rptr. 427] [same]; *Barrett v. Farmers Ins. Group* (1985) 174 Cal.App.3d 747, 751 [220 Cal.Rptr. 135] [" ' "where the terms of an insurance policy are plain and explicit, a court will not indulge in a forced construction so as to cast a liability upon the insurance company which it has not assumed" ' "].)

This case presents the more unusual situation where the insurer hopes to prevail based on arguments extrinsic to the language of the policy. There is no reason the role reversal in this case, however, should make any difference. In this context, what is good for the insurer is good for the policyholder, particularly in light of the rule insurance policies must be analyzed as a layperson would read them, not as an attorney or insurance expert would read them. (*Crane v. State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089].) Accordingly, the plain language of the policy must control in this case, even if it means a CGL policy and a non-CGL policy both provide coverage in this instance.

### Intent of the Parties

ICW vigorously argues it was the intent of the parties there should be no coverage for on road use of the water truck. As to the insurer's intent, ICW points to language in the October 1986 Fire Casualty & Surety Bulletin, an industry publication, suggesting vehicles with permanently attached spraying equipment were not intended to be classified as mobile equipment under the 1986 CGL. As to the policyholder's intent, ICW points to deposition

therefore outside auto exclusion where accident occurred while truck was being used as stationary lifting device].

testimony of the policyholder's broker indicating the policyholder understood the ICW policy to provide no coverage for on road use of the truck.

While insurance industry publications are *helpful* in understanding the scope of coverage insurers are *trying* to delineate in any given policy, they are by no means dispositive. To allow industry interpretations to be the last word on the extent of coverage would contravene the most established rules of insurance contract interpretation: plain, unambiguous language controls; ambiguities must be construed against the insurer; if semantically possible without a strained or forced construction, the policy will be interpreted to provide coverage. (Compare *National Union Fire Ins. Co.* v. *Miller* (1987) 192 Cal.App.3d 866, 872 [237 Cal.Rptr. 632] [plain language of limitations on coverage "must be respected"] with *White* v. *Western Title Ins. Co.* (1985) 40 Cal.3d 870, 881 [221 Cal.Rptr. 509, 710 P.2d 309] [any ambiguity or uncertainty must be resolved against insurer] and *Continental Casualty Co.* v. *Pacific Indemnity Co.* (1982) 134 Cal.App.3d 389, 394 [184 Cal.Rptr. 583] ["If semantically possible, the policy will be given such construction as will fairly achieve its object of securing indemnity for the losses to which the insurance relates. If the language in the policy raises any reasonable doubt as to the fact of coverage or extent of liability, the language will be understood in its most inclusive sense."].)

■ For better or worse, coverage is a matter first and foremost of policy language. Where the policy unambiguously provides for coverage, evidence of intent is irrelevant. "The best evidence of [the parties'] intent is the policy itself." (*National Union Fire Ins. Co.* v. *Miller, supra,* 192 Cal.App.3d at p. 872.) If, as contended by ICW here, it was the intent of the ISO drafters to exclude liability for *all* land vehicles with permanently attached spraying equipment regardless of whether the vehicle was "designed for use principally off public roads," then they should have placed the language about permanently attached spraying equipment in the policy in such a way as to make it clear it applied to *all* categories of vehicles otherwise falling within the definition of mobile equipment instead of placing it where it applies to only *one* of six such categories.

At oral argument, ICW contended it is unfair a court should use industry publications when those publications favor coverage, as was the case in *Maryland Casualty Co.* v. *Reeder* (1990) 221 Cal.App.3d 961 [270 Cal.Rptr. 719], but ignore those same publications when they favor noncoverage. ICW has a point. Any actual reliance by *Reeder* on the Fire Casualty & Surety Bulletin is, indeed, questionable. *Reeder* justified "reliance" on the Fire Casualty & Surety Bulletin on Civil Code section 1645, which provides, " 'Technical words are to be interpreted as usually understood by persons in

the profession or business to which they relate, unless clearly used in a different sense.' " (*Maryland Casualty Co. v. Reeder, supra,* 221 Cal.App.3d at p. 973, fn. 2.)[8] This rationale would appear to contravene the established principle that words in an insurance contract are to be interpreted as a layperson would interpret them (e.g., *Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764] ["Words used in an insurance policy are to be interpreted according to the plain meaning which a layman would ordinarily attach to them."]) and not as an insurance expert would read them (e.g., *Delgado v. Heritage Life Ins. Co.* (1984) 157 Cal.App.3d 262, 271 [203 Cal.Rptr. 672] [" ' "the policy should be read as a layman would read it and not as it might be analyzed by an attorney or an insurance expert' " ' "]).[9]

The rule requiring words in insurance policies be interpreted as laypersons would read them makes sense. Policyholders, as a general rule, do not have ready access to the Fire Casualty & Surety Bulletin. What they receive for their premiums is a policy, i.e., words written on paper. They must depend on those words to know what risks are covered and what are not. The consequences a risk may not be covered can be catastrophic. Obviously, the scope of the risks covered by a policy cannot depend on an industry publication which the policyholder might never see.

Likewise, evidence of a policyholder's "intent" is also unavailing against the plain language of the policy. A policyholder's "reasonable expectation" of coverage is only relevant when the policy is ambiguous. (E.g., *Morris v. Atlas Assurance Co.* (1984) 158 Cal.App.3d 8, 17 [204 Cal.Rptr. 95]; *Wolf Machinery Co. v. Insurance Co. of North America* (1982) 133 Cal.App.3d

---

[8] "[U]nder California law reliance on the FC & S bulletin is appropriate under Civil Code section 1645 . . . ."

The *Reeder* court did not, however, need to "rely" on insurance industry interpretations to reach its result. Those interpretations merely acknowledged the clear implication of the policy language before the court. Specifically, the policyholders in *Reeder* purchased a broad form property damage endorsement which eliminated the words "or on behalf of" from an exclusion for "property damage to work performed by or on behalf of" the named insured.

The Fire Casualty & Surety Bulletin, as well as an ISO circular and an insurance industry commentator, acknowledged the obvious narrowing in the scope of the exclusion effected by the change. The exclusion no longer operated against damage to asubcontractor's work when the insured was a general contractor. (See *Maryland Casualty Co. v. Reeder, supra,* 221 Cal.App.3d at pp. 971-972.) The court could have easily reached the same result without ever mentioning any "industry" interpretation.

[9] Of course, an insurance expert would presumably know the rule about words being interpreted as an ordinary layperson would interpret them. The potential for a most ingenious paradox is apparent. Common sense, however, solves the paradox. The rule about not interpreting a policy as an insurance expert would interpret it must be confined to interpretations based on industry sources (such as the Fire Casualty & Surety Bulletin) which do not mesh with the interpretations a layperson would make.

324, 328 [183 Cal.Rptr. 695].) When policy language is clear there is no coverage under the terms of the policy, it makes no difference whether a policyholder reasonably believed he or she had coverage. The language is dispositive. But by the same token, when the policy language is clear there *is* coverage, it should make no difference if the policyholder may have believed he or she did not have coverage. "Where the underlying facts are not disputed, construction of an insurance policy presents a question of law." (*Merced Mutual Ins. Co.* v. *Mendez* (1989) 213 Cal.App.3d 41, 45 [261 Cal.Rptr. 273].) Again, a rule must be applied which, while it usually works in favor of insurers, here must work in favor of the policyholder.

### The Effect of ICW's Failure to Defend

■ ICW argues the trial court erred by ruling it waived its "coverage defenses" by "wrongfully refusing" to defend. The argument is based on the distinction between a liability insurer's duty to indemnify a policyholder if the policyholder sustains a liability for a judgment for damages covered by the policy and the insurer's duty to defend a lawsuit brought against the policyholder if the lawsuit *potentially* could result in damages that would be covered by the policy. (See *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275-276 [54 Cal.Rptr. 104, 419 P.2d 168].)

Our analysis above renders the issue moot. The judgment may be affirmed even if the trial court ruled incorrectly on the waiver issue. (See *United Pacific Ins. Co.* v. *Hanover Ins. Co.* (1990) 217 Cal.App.3d 925, 933 [266 Cal.Rptr. 231] ["We uphold judgments if they are correct for any reason, 'regardless of the correctness of the grounds upon which the court reached its conclusion.'"].) If this were a case where, at the time of the request for a defense against the *tort* claim brought against the policyholder by the third party claimants, the facts appeared as if the auto exclusion *might* apply, and facts during the litigation of that *tort* claim (not defended by ICW) revealed the auto exclusion *did* apply, then the waiver issue might have applicability here.

But this is not such a case. It makes no difference whether ICW "waived" its right to assert the applicability of the auto exclusion because that exclusion is not applicable anyway. In this case, the duty to indemnify on ICW's part arises directly, by the structure and language of the policy, not because of the loss of the *right* to assert an *otherwise applicable* auto exclusion. There is a difference between the right to assert the applicability of an exclusion and the actual applicability of that exclusion.

On the other hand, ICW does not challenge the *reasonableness* of the attorneys' fees or settlement amounts incurred by American Star in defending

the policyholder in this case, possibly because it realizes it has waived *that* right. (See *State Farm Mut. Auto. Ins. Co.* v. *Allstate Ins. Co.* (1970) 9 Cal.App.3d 508, 529 [88 Cal.Rptr. 246]; see also *Mullen* v. *Glens Falls Ins. Co.* (1977) 73 Cal.App.3d 163, 173-174 [140 Cal.Rptr. 605].)

## CONCLUSION

ICW's policy obligated it to defend and indemnify the policyholder in this case. American Star paid at least a portion of that obligation, and therefore was entitled to contribution as having paid more than its share of the two insurers' common obligation. (See *United Pacific Ins. Co.* v. *Hanover Ins. Co., supra,* 217 Cal.App.3d at pp. 935-936.) ICW raises no challenge to the appropriateness of the equal division of defense and indemnity costs made by the trial court, so we need not concern ourselves with that aspect of the judgment. In all contested respects the judgment is correct. Accordingly, the judgment is affirmed.

Crosby, J., and Moore, J., concurred.

## APPENDIX

8. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:
   a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;
   b. Vehicles maintained for use solely on or next to premises you own or rent;
   c. Vehicles that travel on crawler treads;
   d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:
      (1) Power cranes, shovels, loaders, diggers or drills; or
      (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;
   e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

  (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

  (2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos:"

  (1) Equipment designed primarily for:

    (a) Snow removal;

    (b) Road maintenance, but not construction or resurfacing;

    (c) Street cleaning;

  (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

  (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.