74

OCCIDENTAL CHEMICAL
CORPORATION,
Plaintiff,

v.

AMERICAN MANUFACTURERS
MUTUAL INSURANCE
COMPANY, Defendant.

No. 91 Civ. 5084 (JSM).

United States District Court,
S.D. New York.

Feb. 10, 1993.

Judith S. Roth, Phillips Nizer Benjamin Krim & Ballou, New York City, for plaintiff.

Andrea Balsamo, Alan Miller, Robins Kaplan Miller & Ciresi, Wellesley, MA, Mark

Hyland, Valerie Ringle, Steward & Kisiel, New York City, for defendant.

## MEMORANDUM ORDER AND OPINION

MARTIN, District Judge:

When is a trunnion not a kiln? This riddle, which has plagued not a single man or woman throughout the ages, is nonetheless the crux of these cross-motions for summary judgment.

Plaintiff Occidental Chemical Corporation ("OCC"), a division of Occidental Petroleum Corporation ("OPC"), operates a chemical plant in North Carolina. In June, 1983 defendant American Manufacturers' Mutual Insurance Company ("American Manufacturers") issued an accidental insurance policy to OPC which covered OCC (the "Policy"). The Policy, entitled a "General Boiler and Machinery Policy," insured "Objects" as defined in Endorsement No. 117:

Definition of Object

"Object" shall mean any boiler, any fired or unfired vessel normally subject to vacuum or internal pressure other than static pressure of contents, any refrigerating system, any piping with its accessory equipment, and any mechanical or electrical machine or apparatus which generates, controls, transmits, transforms or utilizes mechanical or electrical power, but

Object shall not mean or include

.    .    .    .    .

3. Any structure, foundation or setting (other than a bed plate of a machine) supporting or housing such Object; or any oven, kiln (including bull gear) or furnace or any insulation or refractory material;

In or about January, 1983, while the Policy was in effect, damage was sustained to the trunnion assemblies associated with the No. 3 Kiln in OCC's North Carolina facility. To put the dispute into context, a brief discussion of kilns and trunnions is necessary.

OCC's kiln is what is known as a "rotary kiln," which involves a long, narrow cylindri-

cal tube (240' × 15' in diameter, in this case) which rests at a slight incline and in which substances are heated as they slide down the tube. Because the tube is designed to rotate, the kiln requires a motor, which turns the cylindrical tube through a gear system. The gear attached directly to the rotating tube and which transfers the motor's force into rotation of the tube is known as the "bull gear."

Further, because an item of this size and shape which must rotate can hardly rest on the ground or simple supports, mechanisms to support it while allowing it to rotate freely are required. The cylindrical tube is encircled in three places by rings, also known and better visualized as "tires." These tires, in turn, rest on trunnion assemblies, or trunnions, also known as support rollers, which provide counter-rotating rollers to enable the cylindrical tube to rotate freely; in a rough analogy, the system resembles a hot dog rotating on a grill with rollers at a sports arena. *See* Exhibits A, B to Affidavit of Gilbert O. Rabbe (diagrams of trunnion assemblies); *see also* Exhibit 3 to Affidavit of Andrea I. Balsamo (pictures of trunnion assemblies).

The parties are in agreement that the value of the damage, exclusive of interest, is $387,864.00.[1] The main question presented on these cross-motions for summary judgment is whether the trunnion assemblies are covered under the Policy.

*Discussion*

OCC contends that a trunnion assembly is an "Object", as defined in the Policy, and that none of the exclusions apply. American Manufacturers, while not disputing that a trunnion assembly is an Object, claims alternatively (1) That a trunnion assembly is part of a kiln, and is thus excluded under paragraph 3; and (2) That, if found not to be part of a kiln, a trunnion assembly is a "structure, foundation or setting", and thus excluded under the same paragraph.

---

1. Due to typographical errors, this figure occasionally appears in OCC's submissions as "$387,-

684.00."

■ A federal court sitting in diversity will apply the conflict of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co.*, 887 F.2d 437, 439 (2d Cir.1989); *Stonewall Ins. Co. v. National Gypsum Co.*, 1992 WL 188434, 1992 U.S.Dist. LEXIS (S.D.N.Y. 1992). Thus, New York conflict of law rules, which mandate an interest analysis, determine which state's law governs. When insurance policies are at issue, it is appropriate to look at where the policies were issued and where the insured has its principal place of business. *Id.; Golotrade Shipping & Chartering, Inc. v. Travelers Indem. Co.*, 706 F.Supp. 214, 218 (S.D.N.Y.1989). An examination of the facts reveals, and the parties do not contest, that California has the greatest interest in this matter. OPC, the party to whom the Policy was issued, was incorporated and had its principal place of business in California; the Policy was issued and delivered there. OPC's insurance broker was also from California, and the premiums were paid in that state. New York conflict of law rules dictate that California substantive law shall apply.

As the California Supreme Court stated recently:

> Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. ([Cal.] Civ.Code § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. *(Id.,* § 1639.) The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" *(id.,* § 1644), controls judicial interpretation. *(Id.,* § 1638.) Thus, if the meaning a layperson would ascribe to contract language is not ambiguous we apply that meaning.

**2.** It should be stressed that the extrinsic evidence here considered is not being used to divine an authoritative interpretation of the language, but rather to provide information necessary to understand the plain meaning of the words. *Cf.*

*AIU Ins. Co. v. FMC Corp.*, 51 Cal.3d 807, 274 Cal.Rptr. 820, 831, 799 P.2d 1253, 1264 (1990) (case citations omitted). *See Reserve Ins. Co. v. Pisciotta*, 30 Cal.3d 800, 180 Cal. Rptr. 628, 631, 640 P.2d 764, 767–68 (1982) (en banc); *American Star Ins. Co. v. Ins. Co. of the West*, 232 Cal.App.3d 1320, 284 Cal. Rptr. 45 (1991).

■ Turning to the language of the Policy, an obstacle arises in that a "layperson" would be unlikely even to know what a "trunnion assembly" is. It is appropriate to examine the language of the Policy as would a layperson who is knowledgeable about kilns and trunnion assemblies; what is to be guarded against is addressing the issue from the standpoint of one peculiarly knowledgeable about insuring such items or litigating such coverage. "[W]ords in an insurance contract are to be interpreted as a layperson would interpret them, and *not* as an insurance expert would read them." *American Star*, 284 Cal.Rptr. at 51 (citations omitted; emphasis in original); *see also Delgado v. Heritage Life Ins. Co.*, 157 Cal.App.3d 262, 203 Cal. Rptr. 672 (1984) (layperson standard does not contemplate analysis as "attorney" or "insurance expert").

The $384,000 question is therefore: would a layperson understand the word "kiln" to include the trunnion assemblies on which the cylindrical tube rests?

■ The trunnion assemblies are clearly a "component part" of the kiln, and are thus excluded from coverage; no genuine issue of material fact exists as to this determination. Purchase documents for the No. 3 kiln discuss the trunnion assemblies as part of an entire, single unit package, in contrast to the motor which is sold separately.[2] Deposition testimony by Curtis Pearson, OCC's insurance broker, that in his numerous inspections of other rotary kilns he had never seen one without trunnion assemblies is also relevant, as are reports from OCC engineers and personnel which often seem to refer to the trunnion assemblies as component parts of

*American Star,* 284 Cal.Rptr. at 50 ("While insurance industry publications are *helpful* in understanding the scope of coverage insurers are *trying* to delineate in any given policy, they are by no means dispositive").

the No. 3 kiln. Clearly, the trunnion assemblies are commonly considered to be a part of the kiln.

An examination of the entire system bolsters this view. Without operating trunnion assemblies, the kiln might function, but it would clearly not function as a rotary kiln and its usefulness would be significantly diminished. There is no doubt that a layperson, having viewed the No. 3 kiln and learned its functions and design, would consider the trunnion assemblies to be a part of it within the plain meaning of the Policy.

OCC's arguments that the trunnion assemblies are wholly separate items are not persuasive. That dictionary definitions of "kiln", which essentially define it as a heated enclosure commonly used to process ore and ceramics, *see, e.g.* Webster's Third International Dictionary (1986) ("an oven, furnace or heated enclosure used for processing a substance by burning, firing or drying"), fail to include any mention of rotation machinery is hardly dispositive in light of the very limited technical and specific detail provided by such reference books.

 Similarly, the specific inclusion of the "bull gear" in the kiln exclusion does not imply a conclusion that the language of the Policy contemplates coverage of trunnion assemblies. OCC argues that for this language to be meaningful, the bull gear, an item actually affixed to the cylindrical tube, must not have been considered to be a part of the "kiln"; otherwise, specific inclusion of it in the exclusionary clause would not have been necessary. OCC pursues this point by suggesting that American Manufacturers similarly should have used words such as "and including trunnion assemblies" in order to exclude those items, and concludes that failure to do so proves that coverage exists.

However, the language regarding the bull gear was inserted in order to define the coverage with reference to the motor powering the rotation. Since, as the parties agree, the motor is covered under the Policy, the bull gear language draws a line in coverage between the bull gear (excluded) and whatever gear it meshes with which is one step closer to the motor (covered). Absent such language, an issue as to where coverage of the motor ended and lack of coverage of the kiln began would be unavoidable if any intermediate part failed. There is no such problem as regards the trunnion assemblies; no line needed to be drawn, and so no additional language was necessary.

Because an examination of the plain meaning of the language of the Policy yields the result that there is no coverage, it is unnecessary to reach either American Manufacturers' claim that the trunnion assemblies are excluded as a "structure, foundation or setting" or OCC's demand for pre-judgment interest.

For the reasons stated above, defendant American Manufacturers' motion for summary judgment is GRANTED, and the claims against them are DISMISSED; plaintiff OCC's motion for summary judgment is therefore DISMISSED as moot.

SO ORDERED.