I/N KOTE, an Indiana general partnership, Plaintiff–Appellant,

v.

The HARTFORD STEAM BOILER IN-SPECTION AND INSURANCE COM-PANY, a Connecticut corporation, De-fendant–Appellee.

No. 96–2052.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 8, 1996.

Decided June 11, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied July 11, 1997.

Louis R. Hegeman, Barry S. Hyman, Gould & Ratner, Michele Odorizzi (argued), Mayer, Brown & Platt, Chicago, IL, for Plaintiff–Appellant.

Mark N. Senak, Thomas B. Keegan, Edward W. Gleason, Susan M. Griesgraber, Charles L. Philbrick, Richard B. Allyn, Terrence R. Joy (argued), Robins, Kaplan, Miller & Ciresi, Minneapolis, MN, for Defendant–Appellee.

Before EASTERBROOK, MANION and ROVNER, Circuit Judges.

MANION, Circuit Judge.

I/N Kote and Hartford Steam Boiler Inspection and Insurance Company dispute the meaning of an exclusion to coverage contained within a policy Hartford issued to Kote. The dispute presents us with the question of whether revolving cylinders known as "rolls" which extend through a "furnace" are part of the "furnace." The district court concluded that the affected rolls were part of the furnace; thus Hartford was not obligated to cover substantial losses resulting from heat damage to the rolls. Because we conclude that Hartford's furnace exclusion does not clearly nor unmistakably exclude from coverage the rolls extending through the furnace, we reverse and remand.

**I.**

Between 1989 and 1991, I/N Kote, a general partnership between subsidiaries of Inland Steel Corporation and Nippon Steel Corporation, built a half-billion dollar state-of-the-art galvanizing facility in New Carlisle, Indiana. The facility includes both an electro-galvanizing line as well as a hot dip continuous galvanizing line. This case concerns the latter, which was completed in November of 1991 and went on line sometime in December 1991 or January 1992.

*The I/N Kote Continuous Galvanizing Line*

I/N Kote's facility includes a highly automated Hot Dip Continuous Galvanizing Line[1] ("CGL") which applies zinc to the surface of a continuous length of steel. The CGL anneals (a process of heating and slowly cooling hard steel to soften it and render it flexible and formable) and galvanizes (a process of coating steel with zinc to retard oxidation) a continuous strip of steel substrate. The CGL consists of a series of operations, each contained in a separate section along the length of a very long building. The process begins in the "entry section" where steel substrate arrives in 45-ton coils which are uncoiled and welded together, end to end. The now-continuous strip of steel passes through an alkaline and electrolytic "cleaning section," which feeds into the "entry looper" storage section. The entry looper stores up a sufficient stock of steel coming out of the welder so that the steel can be carried through the rest of the line at a steady, regulated speed unaffected by the uncoiling and welding of the incoming steel.

After exiting the entry looper, the steel band enters the annealing furnace, a ten-story-high enclosure where it passes through four zones, each also called a "furnace": first it enters the "radiant tube furnace," after which it passes through the "soaking furnace"; from there the steel strip is carried through the "slow cooling furnace" and the "jet-cooling furnace." The radiant tube furnace employs gas-fired radiant tubes to raise the steel to a temperature between 825 to 900 degrees Celsius; the soaking furnace maintains this temperature with electrical radiant tubes; the slow cooling furnace uses water-cooled heat exchangers and fans to slowly lower the temperature of the steel;

---

**1.** "Line" in this context refers to "an arrangement of manufacturing or assembling operations designed to permit sequential occurrence on various stages of production." Webster's Third New International Dictionary, 1991.

and the jet-cool furnace plunge cools the steel to roughly 500 degrees Celsius, the correct temperature for immersion in the molten zinc in the next stage of the line. The four "furnaces" contained within the annealing furnace section of the line are pressurized enclosures containing a hydrogen and nitrogen atmosphere to prevent oxidation of the steel substrate during annealing which might interfere with the galvanizing process. There is no open combustion; the heat is generated either by gas combustion inside tubes which then radiate the heat and warm the steel, or by electric radiant tubes. No heat is applied during the latter two phases, the slow cooling furnace phase, and the jet-cool furnace phase; instead heat is extracted during these operations.

From the annealing furnace section, the steel passes into the "pot," à ceramic tank containing molten zinc. Exiting the "pot," the steel passes through a holding zone where the temperature is moderated and the steel is subject to a nitrogen gas blanket to provide for proper adhesion of the zinc. The strip is further cooled in an "atomized water fog cooler." From there the strip passes through an "air jet cooler" and then into a "galvannealing furnace" where the cooling and heating zones are controlled to create a proper finish on the steel. The strip next passes through a water quench tank, and then a "skim pass mill" to provide a smooth finish. The steel enters a "delivery looper" which plays the same function, in reverse, as the entry looper, holding excess steel in order to assure the continuous strip moves through the critical stages of the line at a uniform speed. From the delivery looper the steel is sheared back into lengths and recoiled onto reels.

Because each stage of the line performs a constant function and maintains a uniform temperature, the process of annealing and galvanizing occurs by moving the steel substrate through the stages at a rate which exposes any given section of the steel to each of the steps in the process for an exact period of time. As any section of steel is connected to the next, in one continuous length, the entire strip of steel must be moved at a steady and carefully controlled rate. The speed and tension are controlled by the facility's robotics, which consist primarily of 600 large roller mechanisms, which are referred to as "rolls": revolving cylinders shaped roughly like rolling pins, over and around the barrel of which the steel is transported. The speed and tension of the continuous steel strip are dependent on the speed at which the rolls rotate; their rotation is controlled by computers and motors that were purchased from Melpac and General Electric. These controls operate independently from those that control the function of the various steps, such as the radiant tube temperature, the cooling jets, or the molten zinc temperature. For example, unlike the roll mechanisms, their motors, and computers, the annealing furnace is regulated by a Yamatake control system which monitors and regulates the atmosphere, combustion system, and waste gasses.

While the barrels of the rolls (the part of the roll that actually carries the steel strip) are all approximately the same width, size, and weight, and while the rolls all perform essentially the same function of controlling speed, tension, and position of the steel as it passes through the various steps of the process, not all the rolls are identical. Some rolls are located in areas subject to extreme conditions such as heat, corrosion (the sink roll is submerged in molten zinc in order to assure the steel's passage through and coating by the liquid metal), or moisture (the rolls in the quenchers are immersed in water and therefore the barrels are constructed of stainless steel). At issue in this case are the 33 rolls contained in the area of the line identified as the "annealing furnace." Because these barrels extend through the area of the "furnace" subject to extreme temperatures, they are constructed of a special centrifugally cast alloy and each roll costs approximately $75,000, compared to the roughly $20,000 cost of a common production roll. (The sink roll costs $85,000 and an "NSC top roll" costs $100,000.) Only the barrel of the roll extends into the high temperature of the annealing furnace. The balance of the roll mechanism, the shafts, the bearings, power couplings, drive shaft, gear box, and motor are all located on the outside of the annealing furnace walls and

remain at ambient temperature. According to the schematics in the record, the end bells, which are located on either end of the barrel, connecting the barrel to the shafts, apparently are subject to the furnace temperatures on their barrel side but not so on their shaft side.

*I/N Kote's Loss*

On January 30, 1992, tension readings began to fluctuate and an unusual noise emanated from inside the annealing furnace. I/N Kote shut down the line and found a broken roll inside the annealing furnace at position 26. The roll was "blanked" by removing it from the furnace and welding steel plates over the holes on either side of the furnace through which the roll had passed. I/N Kote began to bring the system back on line with the steel strip passing directly from roll 25 to roll 27. Because of the missing roll, I/N Kote engineers slowed the speed at which the steel strip passed along and through the line and adjusted the temperatures of the various operations. In this manner, the line could continue to anneal and galvanize the steel strip but at a lower speed and lower output. On February 3, while in the process of bringing the operation back on line, I/N Kote discovered another broken roll inside the annealing furnace at position 2.

I/N Kote viewed this second event as an "alarming trend" and shut down the line in order to inspect the remaining rolls. I/N Kote discovered that 29 of the 31 remaining unbroken rolls were cracked. The cracked rolls were all temporarily mechanically repaired with "collars" and the broken rolls replaced with spare rolls also fitted with "collars." The line resumed operation on April 1, 1992 and continued to operate until June 15, 1992 when it was again shut down until July 1 while engineers replaced the broken and cracked rolls with newly fabricated rolls.

*Insurance*

I/N Kote carried insurance on its CGL through Hartford Steam Boiler Inspection and Insurance Company. Both while the CGL was under construction as well as after it went into production, I/N Kote had it insured with monthly binders from Hartford (the final policy was not completed and signed until after the incident at issue in this litigation). The policy provided coverage for losses, including consequential damages such as business interruption in the event of an accident resulting in damage to a covered "object." An endorsement titled "Object Definition No. 7" sets out what is and is not a covered "object." With respect to what is covered, the endorsement provides in section 1(a):

"Object" means any:

(1) Boiler, fired vessel, unfired vessel normally subject to vacuum or internal pressure other than weight of its contents, refrigerating and air conditioning vessels, and any piping and its accessory equipment, and including any boiler or pressure vessel mounted on mobile equipment.

(2) Mechanical or electrical machine or apparatus used for the generation, transmission or utilization of mechanical or electrical power including but not limited to:

(a) Fiber Optic cable;

(b) Robotic equipment. . . .

The endorsement also provides for exclusions, among them section 1(b), which explains:

"Object" does not mean any:

. . . (6) Oven, stove, furnace, incinerator, pot or kiln; . . . .

The question of coverage thus centers on whether the rolls were an "object" covered by the Hartford policy. I/N Kote first notified Hartford of the problem with the rolls on February 6. On May 5, 1992, Hartford formally denied coverage for the direct and indirect costs associated with the broken rolls. This litigation followed. The parties do not dispute that the CGL rolls, generally, are covered under section 1(a)(2) of the policy. The dispute arises over whether those rolls carrying steel through the annealing furnace section of the line are excluded by the section 1(b)(6) exclusion for "furnaces." Hartford maintains that because the 33 broken or cracked rolls are located inside that portion of the CGL identified as the "annealing furnace," they are part of the furnace and thereby are excluded under "Object Definition" 1(b)(6). I/N Kote argues the rolls are

neither a "furnace" nor even part of a furnace, but rather are part of the robotics which the policy explicitly covers. At best, I/N Kote argues, the policy is ambiguous with regard to whether the term furnace encompasses the rolls, and must be construed in favor of coverage.

*The District Court Decision*

Both parties presented the district court with motions for summary judgment on the issue of whether or not "Object Definition No. 7" excludes liability for the broken rolls inside the annealing furnace. After reviewing the submissions, the district court denied I/N Kote's motion and entered judgment for Hartford. The court concluded, initially, that Object Definition No. 7 controlled the answer to the question, despite the fact that the incident occurred before the final policy was issued, because each of the binders Hartford had issued to I/N Kote explicitly mentioned the endorsement's applicability. The court then addressed the legal question of the correct construction of the insurance policy. In doing so, it declined to decide whether Illinois or Indiana law controlled, noting that the "applicable legal standards are the same under both states' laws," a position that both parties maintain on appeal. "[T]he critical question," the court noted, "was whether a reasonable person would have understood the term 'furnace,' as used in subsection (b)(6) of Object Definition No. 7—the furnace exclusion—to include the rolls which position and direct steel strip as it passes through the various annealing furnace zones."

Answering this question in the affirmative, the court relied on several analyses which we discuss further below. Because it determined that the rolls were "unquestionably" part of the furnace, and because they were thereby excluded from coverage under the "plain and unambiguous meaning" of Object Definition No. 7, the court declined to examine extrinsic evidence that the parties did or did not intend to provide coverage to the entire line when they agreed to the insurance binders.

## II.

### A. Standard of Review

■■■ We review a district court's entry of summary judgment *de novo*. *General Acc.*

*Ins. Co. of America v. Gonzales*, 86 F.3d 673, 675 (7th Cir.1996). Summary judgment is appropriate where the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The district court declined to determine whether Illinois or Indiana law controlled this case because it determined that both states employ similar rules of insurance policy construction. If the policy language is clear and unambiguous, it is given its plain and ordinary meaning. *Tate v. Secura Insurance*, 587 N.E.2d 665, 668 (Ind.1992); *National Union Fire Ins. Co. v. Glenview Park Dist.*, 158 Ill.2d 116, 198 Ill.Dec. 428, 431, 632 N.E.2d 1039, 1042 (1994). If the policy is ambiguous, a question of law, then the court must construe the policy in favor of coverage. *Tate*, 587 N.E.2d at 668 ("If there is an ambiguity, the policy should be interpreted most favorably to the insured. It should be construed to further the policy's basic purpose of indemnity."); *Economy Fire & Casualty Co. v. Kubik*, 142 Ill.App.3d 906, 97 Ill.Dec. 68, 70, 492 N.E.2d 504, 506 (1986) ("Ambiguous provisions in which an insurer seeks to limit its liability are construed most strongly against the insurer with the insurer having the obligation to show that the claim falls clearly within the exclusion.").

### B. Analysis

Based on the briefing as well as oral argument, contrary to the district court's determination, we conclude reasonable minds may well disagree over whether the term "furnace," as used in the endorsement, encompasses the damaged rolls. *See General Acc. Ins. Co. of America*, 86 F.3d at 675 (applying Indiana law: "an insurance policy is ambiguous if reasonable persons may honestly differ as to the meaning of the policy language"); *Outboard Marine v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 699, 607 N.E.2d 1204, 1212 (1992) ("if the words in the policy are susceptible to more than one reasonable interpretation, they are ambiguous").

*1. Whether the "annealing furnace" is a "furnace."*

The word "furnace" is not defined in the endorsement, nor in the final version of the

policy. At oral argument, neither party was able to provide the court with a clear definition of "furnace." This is somewhat distressing; both parties seek this court's determination of whether the object that broke down at I/N Kote was part of a "furnace" but neither can tell us what a "furnace" is. How one defines furnace in turn defines whether or not this object, called a "furnace," was a furnace, and also where that object begins and ends. This in turn defines what is inside and what is outside, and perhaps, we hope, what is part of and not part of the furnace. Steeped in the facts of this controversy as they are, if neither party can define a furnace, it is difficult to imagine how a "reasonable person" would define it. Or, more accurately, how we can determine a reasonable person might do so.

I/N Kote argues that what they refer to as an "annealing furnace" is not a "furnace" but rather is an "unfired vessel under pressure." Unfired vessels under pressure are covered by Object Definition No. 7, which explicitly includes as an object any "unfired vessel normally subject to ... internal pressure." The I/N Kote annealing furnace is an enclosure pressurized with a hydrogen and nitrogen atmosphere in which no combustion occurs, as the term is commonly used. The steel is heated by electric and gas-fired radiant tubes. The gas-fueled fire that makes the radiant tubes hot is isolated from the pressurized enclosure inside the tubes. The heat radiates from the tubes to heat the steel. Thus, I/N Kote maintains, while the tubes are furnaces because they produce heat through combustion, the pressurized enclosure into which that heat radiates and through which the steel passes is not a furnace. Under I/N Kote's construct, only the heat-producing part of the annealing furnace is a furnace. Under this construction, the rolls do not extend through the "furnace" and thereby risk being considered part of that "furnace"; they extend only through the unfired vessel under pressure which is not the furnace.

So far so good. Hartford is willing to concede that the annealing furnace is an unfired vessel under pressure but it contends that because the annealing furnace is also a furnace it falls under Object Definition No. 7's exclusions. Hartford argues for a broad meaning of the term "furnace," generally relating it to function. In other words, an object that performs the function of a furnace is a furnace. By defining a furnace by its function, Hartford seeks to encompass the rolls into the definition, as without them this annealing furnace would be unable to function as it was designed to. But Hartford cannot tell us whether a furnace produces heat or makes use of heat. The distinction is important to the extent that both unfired vessels under pressure and boilers are explicitly included in the Object Definition. If the exclusion for things that are furnaces excludes objects that make use of heat, then it would exclude not only the annealing furnace under I/N Kote's construct, but also boilers. And The Hartford Steam Boiler Inspection and Insurance Company which by its very name is in the business of insuring them, maintains that boilers are clearly covered under the Object Definition. So Hartford's undeveloped definition based on function provides us little guidance.

▮ We also have rules of interpretation to contend with. Absent some indication that they are to be understood in a technical sense, we interpret insurance policies using the plain meaning of their words—the meaning to a layperson procuring the insurance. *See General Acc. Ins. Co. of America*, 86 F.3d at 677 (7th Cir.1996)(applying Indiana law, stating rule); *cf. Coley v. State Farm Mut. Ins. Co.*, 178 Ill.App.3d 1077, 128 Ill. Dec. 200, 202, 534 N.E.2d 220, 222 (1989) ("Unless it is obvious that the language in a policy is used in a technical connotation, the language is accorded the meaning which common experience imparts.") A layperson is "one not belonging to some particular profession or not expert in some branch of knowledge or art." *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill.2d 72, 209 Ill.Dec. 684, 694, 651 N.E.2d 1132, 1142 (1995) (Freeman, J. dissenting) (quoting Webster's Third New International Dictionary 1281 (1993)). But when employing a plain meaning analysis, the meaning must not be reduced to that which would be understood by an uninformed layperson. If it were, it would be impossible to write insur-

ance policies covering technical or complex facilities. We must consider the language as an intelligent layperson would. As the district court noted in *Occidental Chemical Corp. v. American Manufacturers Mutual Ins. Co.*: "Turning to the language of the Policy, an obstacle arises in that a 'layperson' would be unlikely even to know what a 'trunnion assembly' is. It is appropriate to examine the language of the Policy as would a layperson who is knowledgeable about kilns and trunnion assemblies; what is to be guarded against is addressing the issue from the standpoint of one peculiarly knowledgeable about insuring such items or litigating such coverage." 820 F.Supp. 74, 76 (S.D.N.Y.1993) (applying California law). The Supreme Court of Indiana has addressed this problem similarly while citing Black's Law Dictionary for the meaning of a policy term: "Black's Law Dictionary is exactly the type of source that an intelligent layperson might rely on when entering into a contract, including an insurance policy." *American States Ins. Co. v. Kiger*, 662 N.E.2d 945, 948 n. 2 (Ind.1996).

In the absence of language in Object Definition No. 7 giving furnace a technical definition, employing this *intelligent* layperson test we conclude that such a person would make some attempt to understand what the term meant in relation to industry generally if not to metallurgy specifically. Webster's Third New International Dictionary (1981) provides us with some understanding of the term "furnace": "an apparatus for the production or application of heat," "an enclosed structure for ... heat treating metal by the application of intense heat produced typically by full combustion." We derive further understanding from two encyclopedias that are more specialized than a general encyclopedia but nonetheless explain technical words in lay terms. The New Illustrated Science and Invention Encyclopedia explains that a "furnace" is "a closed structure in which heat is applied to a load or charge." 8 H.S. Stuttman, Inc., The New Illustrated Science and Invention Encyclopedia 1066 (1987). The McGraw–Hill Encyclopedia of Science & Technology describes a "furnace" as "an apparatus in which heat is liberated and transferred directly or indirect-

ly to a solid or fluid mass for the purpose of effecting a physical or chemical change." 7 McGraw–Hill Encyclopedia of Science & Technology 503 (7th ed.1992). Either of these explanations describes the annealing furnace at I/N Kote's facility. Even narrowly construed, as are exclusions, the term "any furnace" covers the pressurized enclosure in which heat is applied by both gas fired and electric radiant tubes to steel substrate. Whatever an "unfired vessel under pressure" is, and whether or not the annealing furnace is such a vessel, under the plain meaning of Object Definition No. 7, the annealing furnace itself is excluded because it is a furnace.

### 2. Whether the rolls are part of the furnace.

Determining that the pressurized enclosure in which steel is annealed is a furnace, however, does not answer the pivotal question here: are the rolls part of the furnace? The more technical McGraw–Hill Encyclopedia of Science and Invention provides three pages detailing "furnace construction" without describing the mechanical processes for moving a load or charge into and out of the furnace. The more general New Illustrated Science and Invention Encyclopedia explains that there are two types of furnace, those designed for intermittent (batch) operation and those designed for continuous use. The latter, which could describe I/N Kote's facility, "generally consists of a number of zones, preheat, firing, and cooling, and the charge is pushed through the zones on cars using a hydraulic ram which operates from the entrance." This does not tell us that the cars are part of the furnace. Indeed, since they pass into and out of the furnace, we would expect not. Yet they are necessary to make the furnace do to the charge what it is designed to do.

Our critique of the district court opinion helps form our own view on this matter. The district court adopted the analysis employed in *Occidental Chemical Corp. v. American Manufacturers Mutual Ins. Co.*, 820 F.Supp. 74 (S.D.N.Y.1993). In *Occidental Chemical*, the United States District Court for the Southern District of New York, applying California law to an insurance claim arising from

a damaged rotary kiln located in North Carolina, determined for a number of reasons that the trunnions located outside of a rotary kiln were part of the kiln for purposes of a "kiln" exclusion. Whether or not the analysis was appropriate for the kiln in *Occidental Chemical*, for the reasons discussed below with reference to the I/N Kote facility, we do not believe it is sufficient to reach the conclusion that the only reasonable interpretation in this case is that the 33 damaged rolls are part of the object that is a furnace.

The district court reasoned that the 33 rolls that carry steel through the annealing furnace were part of the furnace because they, like the furnace, were supplied by Stein Heurtey, which oversaw the construction of the annealing furnace and installation of the rolls at the New Carlisle facility. Further, the rolls fell within the specifications for the annealing furnace equipment, the primary portion of each roll was located inside the furnace environment, and the rolls were qualitatively different from other rolls because they were designed to operate at higher temperatures. Finally, "although technically operable without the rolls," the court reasoned that the furnace "would be effectively useless for its designated purpose if the 33 furnace rolls were removed."

We find this reasoning unconvincing in several respects. First, the fact that the same subcontractor supplied and installed both the furnace and the rolls speaks to the subcontract bidding process rather than that the two items are part of the same unit. Had Stein Heurtey also provided and installed other portions of the line, the electrolytic cleaning section for instance, we would not infer that that unit was part of the furnace. We would find similarly little merit in a hypothetical argument that the rolls were *not* part of the furnace because they had been supplied and installed by a subcontractor other than Stein Heurtey.[2] In a facility as

immense, complex, and interconnected as this, which company designed, manufactured, or installed which component cannot define for insurance purposes the limits of an exclusion. For similar reasons it is not significant that the specifications for the rolls fell within those for other aspects of the furnace. Because the rolls must extend through the furnace walls with tolerances apparently tight enough to maintain the pressurized hydrogen nitrogen atmosphere inside, and because they must be designed to withstand the various temperatures at each different zone, we would be surprised if the specifications between furnace and rolls were not interconnected. But we would also expect to see related specifications for automobile axles, bearings, brake discs, and wheels; the interconnected specifications do not blur the distinctions between the objects. The rolls are undisputedly part of the robotics, which include the independently controlled 600–roll mechanism designed to transport, position, and tension the steel substrate through the facility. Hartford insists that in addition to being part of the robotics, the 33 rolls carrying the steel through the furnace are also part of the furnace. That the 33 rolls controlling these functions as the steel passes through the annealing furnace were designed in relation to the annealing furnace does not lead us to the conclusion that they are necessarily part of the furnace.

The district court's determination that "the primary portion" of the rolls was located inside the furnace environment is not compelled by the structure of the facility. Even isolating a single roll mechanism from the other 599, we are left with a complex unit that consists of dozens, if not hundreds of parts, only one of which, the barrel of the roll, extends into the interior of the furnace chamber. The roll itself consists of a barrel, two end bells, and two stub shafts. It is connected to a mechanism that is integral to its function: a power coupling, a drive shaft,

2. According to I/N Kote, the rolls were in fact designed by Nippon Steel, supplied by both Stein Heurtey and Nippon Steel, and to the extent supplied by Stein Heurtey, were manufactured by Pose–Marre Construction. I/N Kote also argued in the district court that the rolls were installed, not by Stein Heurtey, but by Gray and I/N Kote. The district court ignored this argument as waived because it was contrary to portions of Hartford's 12(M) statement to the effect that Stein Heurtey had manufactured and installed the rolls with which I/N Kote had neither objected nor sought clarification. This ruling is not under challenge here and we abide by the district court's exclusion of this evidence.

a gear box, a motor, supports, and a control mechanism independent from that of the furnace. To conclude that the primary portion of the roll was inside the furnace requires that one's measurement be by mass rather than by number of component parts, an arbitrary measurement at best. And although the barrels extending through the furnace were of a different composition than production rolls located in other parts of the line, this would not compel a conclusion that they are thereby part of the furnace. At a number of stages along the line the roll barrels are metallurgically more complex than the "common" production rolls used generally throughout the line.

To isolate each roll and describe it as part of its location removes the entire robotic mechanism from coverage. Under such an analysis, the rolls in the entry looper are only covered because the entry looper is covered; likewise for the rolls in each other section of the plant. Under this construction coverage exists for the robotics only indirectly through their location: if that location is covered so are the robotics; if the location is not covered, the robotics are not covered. The problem with this reasoning is that the coverage Hartford agreed to provide was for the continuous galvanizing line, the unique feature of which is the robotic transport system. Object Definition No. 7 specifically covers robotics. The binder specifically states that "robotics considered as production equipment." To thereafter interpret the policy only to cover various operations within the plant along with appurtenant robotic mechanisms essentially converts the policy coverage for the robotics into illusory coverage. The diagram of the plant indicates that a substantial portion of the robotics carrying the steel substrate are inside parts of the facility identified as "furnaces." Indeed, at oral argument Hartford explained that 20–25 percent of I/N Kote's line was not covered under its construction of the policy, despite the "Extended Comprehensive Coverage" issued by Hartford which explicitly covered I/N Kote's "Continuous Galvanizing Line," including, also explicitly, "robotics."

Finally, Hartford contends, and the district court agreed, the rolls are part of the furnace because without one or more of them the furnace cannot perform its function of annealing steel. This analysis relies on defining the furnace operation not as one of producing or applying heat but of annealing a continuous strip of steel. Thus, the argument goes, because a broken roll prevents the steel strip from passing through the various steps of the furnace, and that in turn prevents the furnace from annealing the steel, the rolls are an integral part of the furnace. Obviously the rolls are an integral part of the process because unless the steel can move through the annealing furnace in a controlled manner, the precise annealing process will not occur and the furnace cannot perform its function of annealing steel. But under such reasoning any of the 600 rolls on the line become part of the furnace. The steel passing through the annealing furnace is merely a section of a continuous strip that also passes at the same rate through each of the other sections of the facility from the entry looper to the delivery looper. The rolls are critical to *transporting* the steel along the entire line. A broken roll anywhere along the line, depending upon its location, could cause the steel to stop moving. If the steel is not moving, of course the annealing furnace cannot perform its function of raising and then reducing the temperature of the steel. Thus, under Hartford's broken roll analysis, any critical roll along the entire line (without which the steel will not move) is part of the furnace, because absent that one roll the furnace cannot perform its function as an annealing furnace. In this complex, interconnected machine called the continuous galvanizing line, an analysis contingent on whether a furnace can perform its annealing function without certain rolls is much too broad. The steel transport mechanism by necessity incorporates the rolls into each of the of the operations along the line. If a roll extending through the furnace breaks and stops the steel from moving, the molten zinc pot also will stop performing its function of coating the steel with zinc. Under such an analysis the broken rolls in question here would also be part of the molten zinc pot. Such a broad construction will not work. It incorporates the entire line into the determination of what is included in any

one operational zone along the line and is contrary to the rule of insurance contract construction which mandates that exclusions be construed narrowly.[3]

But whether or not the furnace can anneal steel is the wrong focus. Whether the furnace is annealing steel depends upon whether there is steel present and moving through its various zones. If no steel is present, the annealing furnace is still a furnace and can perform the function of a furnace: producing or applying heat to a "load" or "charge." *See supra* p. 1318. While the ultimate function of the furnace can assist us in determining what is and what is not part of the furnace, that in the absence of the load (here the steel) the furnace does not "perform its function" does not indicate that the load, or the mechanism that holds or transports the load, is part of the furnace. For example, a bread oven's function is to bake bread. Absent bread, it does not perform this function. That does not make the bread or the pans that hold the bread part of the oven, nor does the bread oven cease to be an oven in the absence of bread. The oven can still heat and cool as it is manufactured to do, it just does so without a charge or a load. Its status as an oven has not changed.

 Because insurance policy exclusions are to be construed narrowly, we believe the correct focus on what parts of this facility are parts of the furnace must be confined to what makes that "object" function as a furnace *qua* furnace, not whether at some given moment it cannot perform its ultimate function of annealing steel. The purpose of the entire facility is to anneal and galvanize steel. The purpose of the furnace portion of the facility is to produce, contain within an enclosure,

and apply heat to a charge or load. The charge or load is *not* a part of the furnace merely because the heat is applied to it. Whether or not the mechanism that holds or transports the charge or load is part of the furnace depends on its relation to the furnace. And that depends upon how broadly or narrowly one construes "furnace." But because "any furnace" is part of the exclusion, the rules of insurance policy construction require that we construe it narrowly. The same rules require that we construe inclusions broadly. How these two rules interact where the roll mechanisms intersect the furnace requires that we take another look at the roll mechanism.

There is no question that the failed roll barrel was part of the roll mechanism. And each of the 33 roll mechanisms were part of the overall 600-roll mechanism that operated independently of any section of the line such as the furnaces. There is no question that these robotics were covered by the policy. The binder explicitly states that robotics are part of production equipment and Object Definition No. 7 explicitly covers "any mechanical or electrical machine or apparatus ... including ... robotic equipment." There is no dispute over whether those rolls that carry steel outside of the objects called furnaces are covered. Without specifically excluding certain of the rolls an insured would very plausibly assume that all rolls are covered. Hartford contends that the only thing that keeps these 33 rolls from being covered is that they are part of the furnace. But as described earlier, only the roll barrel and the end caps extend inside the furnace. The bulk of a roll mechanism lies outside the walls of the furnace. Hartford has not argued that those portions of these roll mecha-

---

**3.** Interestingly, Hartford's argument also runs up against the hard evidence that the furnace could in fact perform its function of annealing steel with at least one roll missing. When roll number 26 broke, I/N Kote removed it, sealed the holes in the furnace wall through which it passed, and brought the facility back on line (or was in the process of doing so when a second roll began exhibiting damage as well). Because the furnace could arguably anneal steel without roll 26, then under Hartford's broken roll analysis, roll 26 would not necessarily be part of the annealing furnace. One or two of the 33 rolls might not be part of the furnace under this analysis, depend-

ing upon where they were located and whether the steel could still move without them. But collectively, all the rolls would become part of the furnace were they all damaged—at that point the steel clearly could no longer move through the furnace. If one isolated broken roll is not inherently part of the furnace, does it become part of the furnace when more than one, or several, are broken? Can it be part of the furnace collectively but not individually? We need not answer these metaphysical questions because, as discussed below, the inquiry is misplaced.

nisms that lie outside the furnace are part of the furnace, only that the roll barrels are. Under this argument the roll only becomes part of the furnace to the extent it lies inside the furnace. Interestingly, while the roll passes through the furnace, it is not connected to the furnace; it must be free to rotate and the parts of the mechanism that actually hold and rotate the roll are located outside the furnace.

While it is clear that the rolls are part of the roller mechanism, perhaps one can argue, as Hartford has and as the district court concluded, that the rolls, at least their barrels, are part of the furnace as well. But they are more a part of the roller mechanism than they are a part of the furnace. The furnace can function as a furnace without them. But a roll mechanism cannot function at all without a roll barrel. The barrel is integral to the roll mechanism as a roll mechanism. It is not integral to the furnace as a furnace. Because of their location in the policy, we must read "any part of the robotics" broadly and "any part of the furnace" narrowly. Where the robotics pass through the furnace and their status becomes ambiguous within the terms of the policy, this rule of construction leads to coverage. Thus, the barrels and end caps of the roll mechanisms must be construed as part of the covered robotics rather than as part of the excluded furnace.

No doubt we could suggest ways that Hartford could specifically exclude certain rolls from coverage, but we are not permitted nor inclined to rewrite ambiguous insurance policies. *See American Nat. Fire Ins. Co. v. Rose Acre Farms*, 107 F.3d 451, 457 (7th Cir.1997) (applying Indiana rules of construction).

### III.

Under Indiana law "[a] condition or exclusion in an insurance contract ... must clearly and unmistakingly bring within its scope the particular act or omission that will bring the condition or exclusion into play. Coverage will not be excluded or destroyed by an exclusion or condition unless such clarity exists." *Sur v. Glidden–Durkee*, 681 F.2d 490, 496–97 (7th Cir.1982) (quoting *Hunting-*

*ton Mut. Ins. Co. v. Walker*, 181 Ind.App. 618, 392 N.E.2d 1182, 1185 (1979) (internal citations omitted)). As set out in the policy Hartford issued to I/N Kote, the furnace exclusion neither clearly nor unmistakably excluded the rolls extending through the annealing furnace. Indiana would thus have us construe the policy in favor of coverage. Id. Illinois would do the same. *National Union Fire Ins. Co. v. Glenview Park Dist.*, 158 Ill.2d 116, 198 Ill.Dec. 428, 431, 632 N.E.2d 1039, 1042 (1994).

Accordingly, we reverse the district court's entry of summary judgment for Hartford. We remand with instructions to enter summary judgment for I/N Kote on the issue of whether the rolls fall into the "furnace" exclusion and proceed in a manner consistent with this opinion.